STEINGUT et al. v. GUARANTY TRUST CO. OF NEW YORK (MILLARD et al., Interveners).

UNITED STATES v. GUARANTY TRUST CO. OF NEW YORK (two cases).

District Court, S. D. New York.

Dec. 15, 1944.

Natanson, Pack & Scholer, of New York City, for plaintiff receivers.

Cravath, de Gersdorff, Swaine & Wood, of New York City (Albert R. Connelly, Samson Selig, and Samuel L. Scholer, all of New York City, of counsel), for intervener Millard.

Borris M. Komar, of New York City (David L. Sprung, of New York City, of counsel), for intervener Tillman.

Mathias F. Correa, U. S. Atty., of New York City, Francis M. Shea, Asst. Atty. Gen., and Daniel M. Sandomire, Louis W. Bookheim, Jr., Lester S. Jayson, Howard N. Meyer, and Joseph K. Reichbart, Sp. Assts. to Atty. Gen., for the United States.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City (Ralph M. Carson, William C. Cannon, Francis W. Phillips, and William R. Meagher, all of New York City, of counsel), for defendant.

RIFKIND, District Judge.

On December 27, 1917, Russo-Asiatic Bank, a Russian corporation, had a credit balance with the defendant, Guaranty Trust Company, in New York, of $1,484,156.94. The plaintiffs in the equity action lay claim thereto as receivers of the assets in New York of the Russian Bank, appointed under § 977-b of the New York Civil Practice Act. The United States, as plaintiff in the two law actions, lays claim to the same balance as successor in interest to Soviet Russia, by virtue of the Litvinov Assignment of November 16, 1933.

Defendant Guaranty resists both claims as well as the claims of the intervenors whose status will be described hereinafter.

The three actions were tried together but no true consolidation has been effected; there are no pleadings which define the issues between the receivers and the United States.

### I. The Receivers' Action.

The action in which the receivers now appear as parties plaintiff has had a long history.

It was commenced on May 12, 1919, as an action by Russo-Asiatic Bank as plaintiff against Guaranty Trust Company of New York as defendant. On July 29, 1939, pursuant to the order of the court, the receivers were substituted as parties plaintiff. During the quarter century between

December 27, 1917, when the Russian banking decrees were promulgated, and the Spring of 1943 when this case was tried, many events affecting this action intervened. World War I was concluded; the authority of the Soviet Government was gradually established. For sixteen years, however, the United States officially received the diplomatic representatives of the non-existent Kerensky regime; and in the New York courts the Soviet regime had no effective existence. In November, 1933, the Soviet Government was recognized by the United States and the Litvinov Assignment was executed.[1] In 1936, § 977-b of the New York Civil Practice Act was enacted by the New York Legislature. In 1938, the new Federal Rules of Civil Procedure went into effect, 28 U.S.C.A. following section 723c; and the same year, Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, was announced. United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, was decided by the Supreme Court in 1942. To find the path of justice in the midst of such a changing world is not a simple task.

At the threshold, the receivers are met with a challenge to their status on two grounds: first, that § 977-b is unconstitutional under both the federal and New York constitutions; second, that the court appointing the receivers was without jurisdiction so to do. As a second line of defense, the defendant interposes the plea that the claim of the receivers is barred by the statute of limitations. For its third line of defense the defendant claims that, by reason of the set-off of its claims against Russo-Asiatic Bank and other Russian banks, it owes nothing. Lastly, the defendant contends that the Litvinov Assignment has operated to vest any claim which Russo-Asiatic may have had against it in the United States, to the exclusion of the receivers.

I have come to the conclusion that the complaint of the receivers must be dismissed. In order to facilitate understanding of the reasoning by which I have arrived at this conclusion I shall first state the premises from which this conclusion flows and postpone a statement of the steps by which I have reached these premises:

1. The Russian banking decrees of December 27, 1917, were intended to apply to

---

[1] For text of the Assignment, see United States v. Pink, 1942, 315 U.S. 203, 212, 62 S.Ct. 552, 86 L.Ed. 796.

the assets of Russo-Asiatic in the United States.

2. Under the law of Soviet Russia, the State Bank, on December 27, 1917, succeeded to the ownership of Russo-Asiatic's credit balance at the Guaranty Trust Company in New York.

3. Under the law of Soviet Russia, the government of Russia in 1920, succeeded to the ownership of Russo-Asiatic's credit balance, if any, at the Guaranty Trust Company in New York.

4. In November, 1933, by virtue of the recognition of the Soviet regime, it became the duty of the courts to acknowledge the validity of the acts of the Russian sovereignty from its beginning in 1917, including its acts with respect to private banks.

5. On November 16, 1933, by virtue of the Litvinov Assignment, the United States succeeded to the title of Soviet Russia in the credit balance, if any, of Russo-Asiatic in Guaranty Trust Company in New York.

6. Neither on June 10, 1936, when temporary receivers of the New York assets of Russo-Asiatic were appointed by the Supreme Court of New York, nor at any time thereafter did Russo-Asiatic have any assets in New York.

7. Since, at least as against Russo-Asiatic, the United States was from November, 1933, the owner of the credit balance standing in the name of Russo-Asiatic, the receivership never, in fact, extended to that credit balance by the very terms of the order which created it.

8. If the order creating the receivership be read to encompass this asset, then it must be founded on the non-recognition of the validity of the proceedings by which 'Soviet Russia had acquired it. Such non-recognition is in conflict with the national policy to which the states must yield.

9. There is the possibility, left open by the Pink case, that New York could prefer the local claims of its own citizens; but here two considerations operate against giving effect thereto: (a) There are no "local claims" in the strict sense, since Russo-Asiatic never did business in New York; (b) whatever might be the rights of a New York creditor, if asserted, the receiver is a mere custodian asking possession; Belmont was a custodian who had possession (United States v. Belmont, 1937,

301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134); Pink was a statutory custodian who had possession (United States v. Pink, 1942, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796); their respective claims did not prevail against the United States.

Four propositions, implicit in the foregoing summary statement, require elaboration:

1. I have found in favor of the constitutionality of § 977-b for the reasons which follow:

On June 8, 1936, § 977-b of the New York Civil Practice Act went into effect. Pursuant to the provisions of that statute, in an action in the New York Supreme Court, Albany County, entitled "Elijah Smith, plaintiff v. Russo-Asiatic Bank, defendant," James A. Martin and Irwin Steingut were, on June 10, 1936, appointed temporary receivers of the assets in New York of Russo-Asiatic Bank. They duly qualified. On June 20, 1936, they served upon the defendant a copy of the order appointing them and a demand for the money owing to Russo-Asiatic. On August 6, 1936, the New York court made an order directing service by publication of the summons in the Smith action. Publication of the summons was made in accordance with the terms of the order. Copies of the summons and of the complaint, praying for the appointment of a receiver of the assets in New York of Russo-Asiatic, were mailed, addressed to Russo-Asiatic Bank at 62 Nevsky Prospect, Petrograd, Russia and at Paris, France.

■ We may quickly dispose of an argument of defendant that § 977-b is void as a private statute, designed by its legislative sponsors to serve the purposes of the receivers in this very suit. The act is general in terms, City of New York v. Fifth Avenue Coach Co., 237 App.Div. 383, 388, 262 N.Y.S. 228, affirmed, 1933, 262 N.Y. 481, 188 N.E. 29, and has in fact been applied in many other situations other than the one at bar. Propper v. Buck, 1941;[2] Hirson v. United Stores Corp., 1941;[2] Ludlam v. Riverhead B. & M. Corp., 1939;[2] Oliner v. American-Oriental Banking Co., 252 App.Div. 212, 297 N.Y.S. 432, affirmed, 1938, 277 N.Y. 588, 13 N.E.2d 783.

The private motives of the legislators are neither relevant nor open to inquiry.

---

[1] No opinion for publication.

People ex rel. Wood v. Draper, 1857, 15 N.Y. 532, 545; Matter of New York Elevated Railroad Co., 1877, 70 N.Y. 327, 351; Baird v. Mayor, etc. of the City of New York, 1884, 96 N.Y. 567, 581; Waterloo Woolen Mfg. Co. v. Shanahan, 1891, 128 N.Y. 345, 359, 28 N.E. 358, 361, 14 L.R.A. 481.

Since it is not shown that the order in the Smith action did not fully comply with the provisions of the statute, nor that the provisions of the order were not fully executed, the attack upon the constitutionality of the statute and upon the status of the receivers is mounted upon the same proposition, namely, that the New York legislature and the New York courts lacked any power to deal with Russo-Asiatic, which never did any business in New York and had been dissolved by the law of. its domicile. Nor, it is contended, could the New York court assert jurisdiction over a debt owing from a New York debtor to Russo-Asiatic without notice to the creditor or its domiciliary successor. Any attempt to exercise such jurisdiction, it is contended, runs afoul of the Fourteenth Amendment and Article I § 10 of the Federal Constitution. In the consideration of this question I have laid aside the effect of the Litvinov Assignment.

I am of the opinion that the defendant's position is without merit. The New York courts have sustained the constitutionality of the act. Oliner v. American-Oriental Banking Corp., 1937, 252 App.Div. 212, 297 N.Y.S. 432, affirmed 277 N.Y. 588, 13 N.E.2d 783. See Hirson v. United Stores Corporation, 1942, 263 App.Div. 646, 34 N.Y.S.2d 122, affirmed 289 N.Y. 564, 43 N.E.2d 712.

■ Martyne v. American Union Fire Ins. Co., 1915, 216 N.Y. 183, 110 N.E. 502, and Matter of National Surety Co., 1940, 283 N.Y. 68, 27 N.E.2d 505, do not suggest any constitutional impediment to the enactment of legislation like the statute under review. As the Supreme Court pointed out in Clark v. Williard, 1935, 294 U.S. 211, 214, 55 S.Ct. 356, 79 L.Ed. 865, 98 A.L.R. 347, the matter was one open to choice of policy by the state which is the situs of the property. The Martyne case represented New York's choice. To the extent that § 977-b departs therefrom, it represents a new and equally valid choice. Since the jurisdiction assumed under that statute is in rem, the death of the corporation is no more an impediment to the exercise of such jurisdiction than the death or disappearance of a depositor interferes with the escheat of the deposit to the state. Security Savings Bank v. State of California, 1923, 263 U.S. 282, 44 S.Ct. 108, 68 L.Ed. 301, 31 A.L.R. 391; Anderson National Bank v. Luckett, 1944, 321 U.S. 233, 64 S.Ct. 599, 151 A.L.R. 824.

■ The only remaining question is whether procedural due process has been observed. I am of the opinion that the symbolic taking of the claim into custody by the temporary receivers, the publication and the mailing have satisfied all the requirements. That at the time of the mailing there was no such corporation as Russo-Asiatic at the indicated address, or for that matter at any address, is without significance. Were such a factor deemed material, jurisdiction could never be obtained of property of persons who have vanished or of corporations dissolved by their domiciliary laws. Cooper v. Reynolds, 1870, 77 U.S. 308, 317, 19 L.Ed. 931; Pennoyer v. Neff, 1877, 95 U.S. 714, 727, 24 L.Ed. 565; Huling v. Kaw Valley Railway, 1889, 130 U.S. 559, 9 S.Ct. 603, 32 L.Ed. 1045.

■ 2. The claim of the receivers is not barred by limitations. Demand for the payment of Russo-Asiatic's dollar account with the defendant was made by the refugee board of Russo-Asiatic at Paris, as early as February, 1918. It was refused in April of that year and the ground of refusal asserted by defendant was that the balances were claimed by the de facto government of Russia. We need not consider whether that was a refusal sufficient to start the running of the statute of limitations, for a demand was again made in the Spring of 1919 and upon refusal suit was instituted in this court on May 12, 1919, in the name of Russo-Asiatic Bank.

On July 12, 1938, the plaintiff receivers herein were appointed, by the judgment of the Supreme Court of the State of New York, receivers of the assets in New York of Russo-Asiatic. On July 29, 1939, by an order of this Court the receivers were substituted as plaintiffs in the place and stead of Russo-Asiatic, without passing upon the merits of the receivers' claim or of any defense thereto or the quality or extent of their title.

Upon these facts and such others as will be adverted to, defendant asserts that

the claim is barred by the six year statute of limitations, New York Civil Practice Act Section 48. It maintains that the present action is not a continuation of the 1919 action; that insofar as subdivision (18) of § 977-b retroactively changed the applicable statute of limitations it was unconstitutional; and that the action could not be deemed an asset acquired by the receivers at the time of their appointment.

I am of the opinion that the defense of the statute of limitations does not avail the defendant as against the receivers.

■ It should be emphasized that defendant nowhere challenges the proposition that in 1919 the action was properly commenced and that for some time thereafter the action subsisted. It is of record that at no time was it dismissed for lack of prosecution or for any other reason. In 1939, when the receivers applied for substitution, the governing rules were provided by the Federal Rules of Civil Procedure, Rule 25, 28 U.S.C.A. following section 723c. While it is true that the receivers were not the successors of Russo-Asiatic since they were not appointed as such under the law of the corporate domicile, they would, by virtue of their appointment, become entitled to receive Russo-Asiatic's claim against Guaranty, under the law of New York which controlled that claim at its situs in New York. To say the least, therefore, this is a case of transfer of interest under Rule 25(c), whereby the court is authorized to order the substitution of the transferee as a party.

■ To the argument that by 1939, after the recognition of Russia, the dissolution of the corporation under Soviet law must be noted and that the action had, therefore, abated, the short answer is that essentially this was a claim for a bank deposit as to which Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, applies and under the New York law the action had not abated. N.Y. Civil Practice Act § 977-b(19); 2 Moore's Federal Practice, page 2427.

The only new claim asserted by the receivers in their amended complaint was withdrawn on the trial.

■■ If an alternative view be adopted and the receivers be deemed to have commenced a new action in 1939, they are nonetheless saved from the bar of the statute of limitations by subdivision (18) of § 977-b. Defendant attacks the validity of that provision of the statute under both the state and federal constitutions as violating due process and denying the equal protection of the laws, U.S. Constitution, 14th Amendment, New York Constitution, Article I, §§ 6 and 11. In many states such retroactive legislation is held invalid; 12 C.J.S., Commerce, § 102, p. 456. In New York, the law is not quite so inflexible and an area of permissive action in this field is probably still open. Hulbert v. Clark, 1891, 128 N.Y. 295, 28 N.E. 638, 14 L.R.A. 59; Dictum, contra, Germania Savings Bank v. Village of Suspension Bridge, 1899, 159 N.Y. 362, 368, 54 N.E. 33; House v. Carr, 1906, 185 N.Y. 453, 458, 78 N.E. 171, 6 L.R.A.,N.S., 510, 113 Am.St.Rep. 936, 7 Ann.Cas. 185; Hopkins v. Lincoln Trust Co., 1922, 233 N.Y. 213, 215, 135 N.E. 267; Robinson v. Robins Drydock & Repair Co. 1924, 238 N.Y. 271, 144 N.E. 579, 36 A.L.R. 1310. I think the facts here parallel those considered sufficient in the Robinson case to validate a retroactive lifting of the bar of the statute of limitations. It was not until the decision of Issaia v. Russo-Asiatic Bank, 1934, 266 N.Y. 37, 193 N.E. 543, that it became evident that an impediment existed in the way of the continued prosecution of this action in the name of Russo-Asiatic. To hold subdivision (18) invalid would, therefore, mean that the defendant would have the benefit of limitations although it was in active litigation over the claim with the only one recognized as owner of the claim by the courts of New York.

As far as the 14th Amendment is concerned, Campbell v. Holt, 1885, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483, is still binding upon this Court. It holds that the repeal of a statute of limitations of actions on personal debts does not, as applied to a debtor, the right of action against whom is already barred, deprive him of his property in violation of the 14th Amendment. It is cited in Paramino Lumber Co. v. Marshall, 1940, 309 U.S. 370, 379, 60 S.Ct. 600, 84 L.Ed. 814, without the slightest intimation that the rule has even been brought within the area of doubt; and it is cited as authoritative in Pittsburgh Can Co. v. United States, 3 Cir., 1940, 113 F.2d 821, 824.

■ The evidence does not, in my opinion, warrant the inference urged by defendant that, as early as 1922 or 1923,

the action pending in the name of Russo-Asiatic, as plaintiff, was abandoned by those who caused it to be instituted.

I conclude that the action has neither abated nor been abandoned and that the claim has not been barred by limitations.

3. I have found that the Russian banking decrees operated upon Russo-Asiatic's credit balance in Guaranty Trust Company. The text of the controlling decree of December 27, 1917, is one of revolutionary simplicity. Its object is stated to be the establishment of "A Single People's Bank of the Russian Republic." To attain this object, the decree provides: (1) Banking business is declared a state monopoly; (2) all existing private joint stock banks and banking houses are merged with the State Bank; (3) the assets and liabilities of the liquidated banks are taken over by the State Bank.[3] It would be strange indeed if the Soviet legislators intended that the state bank should assume Russo-Asiatic's liabilities to New York creditors but would not assume to acquire its New York assets. Russo-Asiatic had no branch in the United States and its liabilities were, therefore, clearly Russian liabilities. On its face this decree is all embracive and all extensive. It contains no words of self-limitation. If limitations are to be read into it, they must be found by implication.

The plaintiff receivers profess to find such implications. They suggest that the term "merger" does not mean "corporate merger," since the decree applies as well to unincorporated banks and, therefore, that only the local assets were intended to be combined. But that is a non-sequitur. No inference of territorial limitation can be drawn from the alternative meaning. The most that might be extracted from such a nicety in translation is that the corporate existence of Russo-Asiatic Bank was not at once extinguished. That it was extinguished under Soviet law long before this trial was not questioned by any of the experts who testified. And it was this dilemma which compelled recourse by the experts, called on behalf of the receivers, to doctrines of de facto corporations, stateless corporations, and ownerless property.

If the State Bank did not acquire Russo-Asiatic's foreign deposits, who did? To deny the Russian decree an intention to reach extra-territorial assets is to ascribe to the Russian law makers a purpose to bestow those assets upon anyone except Russians. That is a construction which is hardly to be favored.

Were the text less clear, the purpose vague and the logic of the facts less compelling, we might then be persuaded by such minor considerations as the failure to express extra-territoriality in this decree in the light of the presence of such expressions in some other decrees;[4] the failure to claim foreign deposits; the reenactment of the decrees when the power of the Soviet Government extended to new territory; the treaties with Latvia, Lithuania, Poland and Estonia in 1920 and 1921, which acknowledged the corporate existence of nationalized corporations, the majority of whose stockholders were nationals of these respective states. Similar illustrations are in evidence which are not strictly consistent with the rigorous application of the idea of corporate merger and extra-territoriality. All are readily explained by the exigencies of the revolutionary Russian government accommodating itself to the almost uni-

---

[3] The full text of the decree is as follows: Decree on the Nationalization of Banks.

In the interests of the proper organization of national economy, in the interests of a thorough eradication of banking speculation and the complete emancipation of the workers, peasants, and the whole labouring population from exploitation by banking capital, and also with the object of establishing a single People's Bank of the Russian Republic, genuinely serving the interests of the people and the poorest classes, the Central Executive Committee hereby decrees:

1. Banking business is declared a State Monopoly.

2. All existing private joint stock banks and banking houses are merged with the State Bank.

3. The assets and liabilities of the liquidated banks are taken over by the State Bank.

4. The method of effecting the merger of private banks with the State Bank shall be determined by a special decree.

5. The temporary administration of the business of private banks shall be entrusted to the council of the State Bank.

6. The interests of small depositors shall be fully safeguarded.

[4] Decree concerning the Russian-Belgian Metal Works, December 8, 1917; decree concerning the property of the Romanoffs, December 2, 1918.

versal resistance to its program of nationalization.

They do not avail against the views of the experts who have testified that the decree was intended to have extra-territorial effect; nor against the authoritative exposition of the Commissariat for Justice, on November 28, 1937, that "all nationalized funds and property of former private enterprises and companies * * * constitute the property of the state, irrespective of whether it was situated within the territorial limits of the R.S.F.S.R. or abroad."

To justify so unlikely a finding that it was the intention of the decree to surrender all assets of Russo-Asiatic, which were beyond the territory of Russia, to the refugee directors and non-Russian stockholders or, in the alternative, that the decree envisaged the continued corporate existence of Russo-Asiatic beyond the boundaries of Russia and its functioning as the owner of Russo-Asiatic's foreign assets, strong and cogent evidence of such a purpose would have to be presented. The mere fact that at subsequent times Soviet Russia acted as if one or the other of these hypotheses were fact, is not conclusive, for that is consistent with the explanation of expedient accommodation to the views of a hostile world which only slowly and reluctantly yielded to Russia's social revolution.

Once it is established that the banking decrees were in respect of extra-territoriality no different from the insurance decrees, then, under United States v. Pink and United States v. Belmont, the validity of the Russian banking decree must be recognized retrospectively to 1917, and it follows that Russo-Asiatic had no assets in the United States which a New York court could, in 1936, put into the possession of a receiver.

4. United States v. Pink compels the conclusion, once we have arrived at the determination that the banking decrees, like the insurance decrees, were intended to have extra-territorial effect, that "the right to the funds or property in question became vested in the Soviet Government as the successor" to the State Bank and the Russo-Asiatic Bank; "that this right has passed to the United States under the Litvinov Assignment; and that the United States is entitled to the property as against the corporation and the foreign creditors." [315 U.S. 203, 62 S.Ct. 567]

The question left open by United States v. Pink is whether the United States is entitled to such property as against local New York creditors and against receivers appointed to administer and distribute the property to such creditors and other claimants. 315 U.S. 203, 226, 227, 62 S.Ct. 552, 86 L.Ed. 796. Several considerations lead me to the conclusion that, under the facts of this case, the right of the United States takes precedence over that of the receivers. The first of these is that the receivers, being creatures of an order of the New York Supreme Court, made pursuant to a New York statute, must, in order to have any standing, be able to find their asserted power within the instruments of their creation. The order of June 10, 1936, recites as one of its premises, that Russo-Asiatic Bank "has and is entitled to assets, credits, choses in action and other property, tangible and intangible within the State of New York" and it orders the appointment of temporary receivers "of all the property" of Russo-Asiatic Bank, in the State of New York. The judgment of July 12, 1938, likewise recites as one of the premises upon which it is founded that Russo-Asiatic "had and still has and was and still is entitled to assets, credits, choses in action and other property in the State of New York"; and it orders the appointment of permanent receivers of "all the property of Russo-Asiatic Bank, in the State of New York."

At the time this order was made, Russo-Asiatic Bank had no assets or property of any character in the State of New York and had not had any property in the State of New York for over twenty years. The receivers in consequence took nothing by their appointment.

So long as New York could effectively maintain its public policy of not recognizing Russia's nationalization decrees it could, of course, proceed on the premise the Russo-Asiatic still had assets in New York. Moscow Fire Insurance Co. v. Bank of New York and Trust Co., 1939, 280 N.Y. 286, 20 N.E.2d 758. But since November 16, 1933, that policy has been in collision with national policy, in a field in which national policy was supreme. United States v. Belmont, supra; United States v. Pink, supra. Since that time, the courts have been bound to give effect to the national policy of recognition; and in United States v. Pink that policy was

potent enough to upset an order made by the New York Court of Appeals in 1931, two years before the Litvinov Assignment. It surely is powerful enough to disregard a judgment made five years after that assignment, when that judgment is in conflict with it.

 The receivers argue that, unlike the facts in the Pink case, the facts here do not bring national and state policy into conflict; that recognition of the Russian nationalization decrees does not require nullification of New York's policy with respect to the administration of New York assets of defunct foreign corporations; that nothing in § 977-b, the only New York policy they seek to implement, is in conflict with the national policy. It should be noted that here we have no local creditors in the sense of creditors who did business with a local office of Russo-Asiatic, since Russo-Asiatic never was authorized to and never did business in New York or in the United States. Secondly, it should be noted that § 977-b does not profess to establish a system of priority for citizens of New York. Creditors holding valid attachments issued out of a New York court prior to the commencement of the action for the appointment of receivers enjoy a priority; subdivision (16). All American creditors who do not hold attachments of the category described are placed in a single classification of priority. It is not necessary to examine ·the allocation scheme in detail. It is sufficient that it proposes a complete scheme of distribution, taking in creditors wherever they may reside, stockholders and domiciliary receivers. That the administration of such a scheme, erected after the United States became the successor in title to the credit, can only by purest coincidence accomplish the purposes of the sovereign parties to the Litvinov Assignment, is to me self-evident. And this becomes especially clear when note is taken of subdivision (19), which provides that the nationalization decrees shall not be deemed to have any extra-territorial effect or validity or apply to property tangible or intangible located in New York.

In contra-distinction thereto, United States v. Pink declares it to be the national policy to acknowledge the extra-territoriality of the Russian decrees when the decrees were so intended, pronounces national policy supreme in this area, and that

indeed, quoting United States v. Belmont, 301 U.S. 324, 327, 57 S.Ct. 758, 81 L.Ed. 1134, "This Court did not stop to inquire whether in fact there was any policy of New York which enforcement of the Litvinov Assignment would infringe since 'no state policy can prevail against the international compact here involved.'" The purpose of the Litvinov Assignment was "to eliminate all possible sources of friction between these two great nations." United States v. Pink, 315 U.S. at page 225, 62 S.Ct. at page 563, 86 L.Ed. 796. "The existence of unpaid claims against Russia and its nationals which were held in this country, and which the Litvinov Assignment was intended to secure, had long been one impediment to resumption of friendly relations between these two great powers. * * * The Litvinov Assignment * * * was also the method adopted by the Executive Department for alleviating in this country the rigors of nationalization. Congress tacitly recognized that policy. Acting in anticipation of the realization of funds under the Litvinov Assignment. (H. Rep. No. 865, 76th Cong., 1st Sess.) it authorized the appointment of a Commissioner to determine the claims of American nationals against the Soviet Government." Id., 315 U.S. 227, 62 S.Ct. at page 563, 86 L.Ed. 796. "And it matters not that the procedure adopted by the Federal Government is globular and involves a regrouping of assets." Id., 315 U.S. at page 228, 62 S.Ct. at page 564, 86 L.Ed. 796.

Manifestly, New York policy is. not globular, is not designed to eliminate obstacles to friendly relations between the two nations, and erects a system of its own for the collection and distribution of the Russian assets. What New York can do every state can do; and in so doing, it is clear that "the power of recognition might be thwarted or seriously diluted." Id., 315 U.S. at page 230, 62 S.Ct. at page 565, 86 L.Ed. 796. To summarize: by means of § 977-b and the orders made herein, New York has gone beyond the establishment of a device for the protection of its citizens who are creditors of Russo-Asiatic or of those who did business with it in New York; it has established a complete system of administration founded upon a policy of non-recognition of the Russian nationalization decrees insofar as New York assets are concerned. Enforcement of this policy "would collide with and subtract from the Federal policy"; Id., 315 U.S. at page 231,

62 S.Ct. at page 566, 86 L.Ed. 796. It must, therefore, yield.

II. The Claims of the United States.

The claims of the United States are asserted in two complaints both at law. The first is addressed to the recovery of the balance of a "special account" standing in the name of Russo-Asiatic; the second seeks the recovery of the general balance standing to the credit of Russo-Asiatic. The substantial issues which emerge between the United States and the defendant Guaranty revolve around the following:

1. Whether the Russian decrees of nationalization, admittedly extra-territorial in intention are to be enforced against an American national, the Guaranty Trust Company.

2. The statute of limitations.

3. The validity and amount of defendant's set-off. These three issues will be treated seriatim after a brief statement of facts applicable to all of them.

In the first action, for the recovery of the special account, the United States asserts its claim in three forms: The first cause of action declares the ownership of the account to have resided in P. V. Baranowsky Ltd., a corporation organized under the laws of Imperial Russia; alleges the nationalization of Baranowsky by the Soviet Government by the decrees nationalizing industrial companies; and traces ultimate ownership into the United States through the Litvinov Assignment.

The second cause of action declares the ownership of the special account to have resided in the Chancery of Credit of the Russian Ministry of Finance for and on behalf of the Russian State and traces title to the United States through the Soviet Government, as successor to the Russian State, and the Litvinov Assignment.

The third cause of action declares the ownership of the special account to have been in Russo-Asiatic Bank, alleges the nationalization of that bank by the Soviet Government by means of the decrees nationalizing banking institutions; and traces ultimate title to the United States through the Litvinov Assignment.

In the second action, for the recovery of the Russo-Asiatic general account, the United States asserts ownership of the account to have resided in Russo-Asiatic Bank, alleges the nationalization of that bank by means of the bank nationalization decrees and the acquisition by the United States of Russia's interest therein by the Litvinov Assignment.

No proof has been offered by the United States to establish the ownership of the special account by Baranowsky. There is in evidence a judgment of the Supreme Court of the State of New York dismissing an action by Baranowsky against Guaranty Trust Company for the recovery of this special account. We may, therefore, in the succeeding discussion eliminate the first count of the first action from further consideration, especially since the Litvinov Assignment provided that the Soviet Government would make no claim with respect to judgments rendered "insofar as they relate to property * * * in which the Union of Soviet Socialist Republics, or its nationals may have had or may claim to have an interest * * *."

1. I return now to the first enumerated issue, whether the Russian banking decrees are to be given effect as against the defendant, an American national. This problem need not detain us long. Both plaintiff and defendant agree that the banking decrees were intended to have extra-territorial effect. By that, I take it, is meant that the State Bank, so far as Russian law was concerned, succeeded to the property and liabilities of Russo-Asiatic regardless of their situs. Manifestly, the decree did not, in words or by implication, purport to vest in the State Bank the property of the Guaranty Trust Company in the United States; nor does the United States claim by virtue of any confiscation or nationalization by the Soviet Government of any property belonging to Guaranty Trust Company. Consequently, I do not reach the proposition argued by defendant, that if the Litvinov Assignment were construed to have such an effect it would run afoul of the public policy of the United States. As I understand the claim of the United States, it is that Guaranty's position is precisely analogous to that of Belmont in United States v. Belmont, and nowhere does it suggest that, if in fact defendant has a property interest in, or a valid claim to the deposit account, it has been cut off by the Russian banking decrees.

2. The statute of limitations.

■ "There can be no true precedent in the books, when the facts are unprecedented." Judge Lehman used these words with reference to the tangled problems which survived the Russian revolution. Russian Reinsurance Co. v. Stoddard, 1925,

240 N.Y. 149, 163, 147 N.E. 703, 707. He called attention to the need of limiting the force of juridical conceptions at the boundary of common sense and justice. I take it that even the statute of limitations involves juridical conceptions which should not be extended beyond the bounds of common sense and justice. New York Cent. & H. Railroad Co. v. Kinney, 1922, 260 U.S. 340, 346, 43 S.Ct. 122, 67 L.Ed. 294. This does not suggest that the statute of limitations, which to be serviceable must be rigid, should be regarded as made of India rubber and shrink or stretch with the chancellor's convenience. See, United States v. Curtiss Aeroplane Co., 1943, 50 F.Supp. 477; Id., 52 F.Supp. 328. It does mean that the facts to which this unyielding measuring rod is to be applied must be examined with a common sense appraisal of the inevitable improvisations which were the product of the long period of nonrecognition of Russia. Occasionally, strict legal definitions will fail to produce results consonant with generally received ideas of justice when, suddenly, the system of law improvised during non-recognition is brought into collision with the paramount national policy which the Supreme Court has found expressed in the act of recognition and in the Litvinov Assignment.

The question is whether on November 16, 1933, the causes of action asserted by the United States were then barred by the six year statute of limitations; N.Y., Civil Practice Act § 48. The action being for the recovery of a bank deposit, a demand is necessary to accrue the cause of action, Civil Practice Act § 15, unless there is a repudiation of liability and notice thereof to the creditor. Tillman v. Guaranty Trust Co., 1930, 253 N.Y. 295, 171 N.E. 61.

It is not suggested that notice of such repudiation was ever given to the Soviet Government, whom we must, with our post 1933 knowledge, treat as having been the owner of the deposit since 1917. Proof of such fact is, however, not necessary to establish the defense of limitations. If under pre-1933 law the defense of limitations had duly matured, that would constitute an "infirmity" in the claim of the United States sufficient to defeat it. Guaranty Trust Co. v. United States, 1938, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224.

The defendant rests its plea of the statute of limitations on two foundations: As to the special account sought in the first action, it asserts that the beneficial ownership of that was in the Ministry of Finance of the Provisional Government of Russia, whose diplomatic representatives were given access to the courts. If this were the fact, the action for the special account would be governed by Guaranty Trust Company v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224, subject only to proof of notice of repudiation to the representatives of that government. This foundation crumbles, however, since I find that ownership of the special account was never in the Provisional Government of Russia but originally in the Russo-Asiatic Bank. Nor do I find in the remarks made by an officer of the defendant to a representative of the Provisional Government evidence of notice of repudiation, especially since the remarks were made to the agent of a regime which never asserted a claim to the fund and were so general in character as to impart no real warning.

The defendant's second foundation is that the refugee directors of Russo-Asiatic had access to our courts when suing in the name of Russo-Asiatic and unquestionably had demanded and been refused payment. It argues that the relation of these directors to the maturation of the period of limitations is the same as that of the representatives of the Provisional Government in Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224.

We may concede for present purposes that a demand by the refugee directors, followed by a refusal in 1918 or 1919, would have caused the claim to lapse before the United States acquired any interest therein in 1933, provided no action had been started in 1919. Such an action was, however, started and is still pending, unless it can be said to have abated or been abandoned. Laying the latter consideration aside for the moment, if defendant's contention is well taken we reach this incongruous result: that although the only ones who could have sued before 1933 did sue and although the only ones who could sue after 1933 did sue, nevertheless the claimants are to be held to have slept on their rights and the defendant to have earned the repose of the statute of limitations. This is the point where common sense rebels. Hardened procedural concepts may present difficulties in conferring

upon one litigant, prosecuting an action at law, the benefits of the tolling of the statute accruing to another litigant who had commenced an action in equity. McConnell v. Caribbean Petroleum Co., 1938, 278 N.Y. 189, 15 N.E.2d 573. But it takes less than "imaginative resourcefulness" to surmount that difficulty. Addison v. Holly Hill Fruit Products, Inc., 1944, 322 U.S. 607, 620, 64 S.Ct. 1215. One simple route is to examine the facts retrospectively as, by virtue of recognition in 1933, we must. United States v. Belmont, supra. Thus viewed, we see a claim which, by means of the banking decrees, was acquired by the Soviet Government, but which, by reason of non-recognition, the Soviet Government could not enforce in our courts. Since the Soviet Government could not sue in our courts the statute of limitations did not begin to run until the disability was removed. Jacobus v. Colgate, 1916, 217 N.Y. 235, 244, 111 N.E. 837, Ann.Cas. 1917E, 369; McCarthy v. Prudential Insurance Co., 1930, 252 N.Y. 459, 464, 169 N.E. 645.

■ This may conflict with the concession that had the directors not sued the statute would have barred this action; but that was a concession arguendo, founded on the recognition that acquiescence in the extinction of claims barred by the running of the statute before recognition is an exception to the general rule of retroactivity which recognition brings into play. Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224; Oetjen v. Central Leather Co., 1918, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726. But I see no reason why this exception should become operative when the claim had not been barred before recognition.

■ Defendant argues that as early as 1922 or 1923, the refugee directors who had caused the 1919 action to be instituted abandoned it. It is not necessary to detail the evidence. Suffice it to say that whatever support it contains for the claim of abandonment is entirely the product of surmise and speculation and altogether too flimsy to support so important a finding as abandonment of a claim the enforcement of which is pending in court.

■ Nor does the claim of abatement of the Russo-Asiatic action upon the "death" of Russo-Asiatic avail the defendant (rule 25(a), Federal Rules of Civil Procedure, became effective September 16, 1938). For such abatement, if it occurred at all, must be attributed to the time of the recognition of Russia on November 16, 1933. When the United States received the claim, it was, therefore, free of the infirmity of a perfected bar of the statute of limitation.

■ From this analysis it is clear that the absence of privity between the United States and receivers is quite irrelevant to the conclusion on the statute of limitations. Nor can Guaranty Trust Co. v. United States, supra, be construed to hold that because a "State of Russia" had access to our courts, it can now be said that this claim against the defendant was enforceable in our courts so as to allow the statute to run. In the Guaranty case the funds in controversy belonged to the Provisional Government whose representatives *were* given access to our courts. It would fly in the face of all reason to suggest that these representatives could enter our courts to enforce a claim transferred by the revolutionary action of a new government, a claim which, in order to assert, they would first have to disavow their authority to act at all. While it is true that for many purposes a sovereign state is a continuum, regardless of the regime which may at any one time be in power, The Sapphire, 1870, 11 Wall. 164, 20 L.Ed. 127, the application of such a principle here would be so manifestly a perversion of common sense and justice as to forbid its consideration. I conclude that the claim of the United States is not barred by limitations.

3. The defendant's second defense is pleaded as a set-off or counterclaim. Briefly stated, its claim is that on December 27, 1917, it had on deposit at Russo-Asiatic and at other nationalized Russian banks a total of Rubles 47,196,382.17; that on that day the Ruble was worth 14¢, so that its total deposits had an aggregate valuation of $6,607,493.50; that by reason of the banking decrees all the Russian banks were merged into the State Bank, which assumed all the liabilities of the absorbed banks; that the amount of its claim is in excess of Russo-Asiatic's credit balance with the defendant; and that, therefore, the U.S. took nothing against defendant by the Litvinov Assignment.

The government contests this claim. First, it asserts that no right to a set-off is shown because plaintiff has failed to establish that the Russian depositories had

breached their obligations to Guaranty; that after the banking decrees the banks continued operation under government regulations, regulations binding on defendant, since the deposits were made in Russia, in Russian banks, and were payable in Rubles, in Russia, under Russian law.

Secondly, the government contends that, regardless of the presence or absence of breach by the Russian depositories, the elements necessary to permit a set-off are here absent, these elements being:

1. That the defendant's claim be "founded on and trusting to" its obligation to the plaintiff as a "means of discharging it"; 3 Storey, Equity Jurisprudence, 14th Edition, § 1871. The government's suggestion is that Guaranty's deposits in Russo-Asiatic were independent of Russo-Asiatic's deposits in Guaranty and that both were without any "implied understanding that they shall cancel each other", Topas v. John MacGregor Grant, Inc., 2 Cir., 1927, 18 F.2d 724, 726, 52 A.L.R. 807, and that certainly that was true with respect to the other Russian banks having no deposits in Guaranty.

2. The claims must be between the same parties, be matured, and "either reduced to precise figures, or capable of being liquidated by calculation without intervention of a jury." 1 Morse, Banks and Banking, 6th Edition, § 335. The government's suggestion is that Guaranty's claims were not matured for want of a demand, Munger v. Albany City National Bank, 1881, 85 N.Y. 580, 586, and that they were not liquidated since they were payable in a foreign currency, Thornton v. National City Bank, 2 Cir., 1930, 45 F.2d 127.

Thirdly, the government argues, assuming the occasion for a set-off, Guaranty's claim against the Russian banks, being for Rubles payable in Russia, must be governed by the judgment-day rule and not the breach-day rule, and that on judgment day, as for a long time since, the Rubles have been worthless. If Guaranty's claim is presented not as a set-off but as a counterclaim, it is defeated by Russia's sovereign immunity, effective even before recognition, since the claims do not arise out of the same transaction. Wulfsohn v. Russian Socialist Federated Soviet Republic, 1923, 234 N.Y. 372, 138 N.E. 24; Kingdom of Roumania v. Guaranty Trust Co., 2 Cir., 1918, 250 F. 341, 343, Ann.Cas.1918E, 524, certiorari denied 246 U.S. 663, 38 S.Ct. 333, 62 L.Ed. 928.

Fourthly, on the underlying issues of fact the government contends that on December 27, 1917, the value of the Ruble was not 14¢ but 6¢; that the aggregate of Guaranty's Ruble credits in Russian banks amounted not to Rubles 47,196,382.17 but only to Rubles 36,533,807.23; and that Guaranty's claim must be further reduced by $5,001,849.79, the amount of the balance in the account in the name of the Russian Ministry of Finance which defendant had applied in part payment of its Ruble claims; see Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224.

Assuming, without deciding, that the facts and circumstances here present a proper occasion for the assertion of a set-off; and assuming similarly that in such a set-off the defendant may aggregate its claims against all the nationalized Russian banks and not be limited to its claim against Russo-Asiatic; and further assuming that on December 27, 1917, a breach of obligation by the Russian banks occurred which gave rise forthwith to a claim by Guaranty and that the value of its Ruble credits on that day determines the value of its Ruble claims; and finally assuming that Guaranty's statement of its claims is correct and that they amount to Rubles 47,-196,382.17, I nevertheless conclude that the United States must prevail because of one finding of fact and one conclusion of law. One finding of fact is that on December 27, 1917, the Ruble had a value which did not exceed 10½¢ and probably ranged between 7 and 10½¢. The conclusion of law is that, in recasting the accounts of Guaranty Trust Company for the purpose of calculating its set-off, there must be deducted from its claims the $5,001,849.79 arising from the credit balance of the Ministry of Finance. Applying the maximum Ruble rate, namely, 10½¢, to the maximum claim of Guaranty the product is $4,955,520.12, or less than the amount already retained by the defendant from the Ministry of Finance account.

I shall now consider the evidence which leads to the finding of fact respecting the Ruble values; and thereafter, the legal principles which move me to include the Ministry of Finance balance in Guaranty's account.

### The Value of the Ruble.

There is great conflict in the testimony concerning the value of the Ruble in the closing days of December, 1917. Not only

is the oral evidence given from the recollection of the witnesses in hopeless contradiction but even the contemporaneous written records show a lack of uniformity. In good measure this lack of order and uniformity is the natural concomitant of revolution, especially a revolution as far-reaching as that which enveloped Russia in 1917, superimposed upon a world war with its attendant interruption to the normal flow of business, mail and telegraphic communication. To some extent the confusion in evidence is an accurate reflection of the confusion which actually prevailed. There were in circulation at least three kinds of Rubles, Romanoff, Kerensky and Duma, each commanding different prices, reflecting, perhaps, the political appraisal of the future of the revolutionary governments. A black market in exchange and currency flourished in defiance of the legally established rates. The value of exchange, in the sense of cable transfers of bank credits, lost contact with the value of Ruble currency and, in the absence, or with the sharp diminution, of international transactions and international arbitrage which tend to produce equivalence, quotations in foreign money markets, such as New York and London, departed from the prices prevailing in Moscow and Petrograd. Consider this complexity after a lapse of twenty five years and add the confusing factor of a thirteen day difference between the Russian and Western calendars, in a situation in which individual days become significant, and then it becomes clear why the ascertainment of the Ruble value on December 27, 1917 is, to say the least, a problem fraught with difficulty and uncertainty.

The evidence adduced here consists substantially of the following: Immediately prior to the revolution of November 7, 1917, when the Kerensky Government was overthrown, the Ruble presented the following picture: the official rate in Russia for ordinary transactions was 15.8 cents per Ruble; the New York market rate for Russian exchange was approximately 13.5 cents per Ruble; the unofficial rate in Russia was approximately 12.5 cents per Ruble.

For the month of December the defendant offered proof consisting of:

(1) New York market quotations showing Ruble values from 12¢ to 13.65¢. Guaranty itself bought and sold substantial amounts of Rubles all through December.

On December 27th, its rate books show a quotation of 13.25¢ per Ruble. On December 27th, it purchased Rubles at 12.90¢ per Ruble. Its Ruble exchange transactions ceased on January 4, 1918. It is to be noted, however, that the Commercial and Financial Chronicle qualified each of its Ruble quotations during December, 1917 with the term "nominal," meaning that transactions were few and isolated.

(2) Mr. Ughet, representative of the Kerensky Government, instructed the National City Bank to pay the Ruble coupons on the internal loan of 1916 at 14¢ per Ruble.

(3) Mr. William Rosenblatt, who was in Russia at the time and there traded in Rubles on an extensive scale, testified that the rate of exchange in Petrograd was in December, 13¢ to 14¢ per Ruble. It is to be noted, however, that the only transactions of which contemporaneous written records were available, showed that he bought from San Galli Grace and Co. on December 21 or December 24, 1917, 500,000 Rubles at 10.5 cents per Ruble. That his memory failed him as to dates or that his memory, after the long lapse of time, failed to distinguish between Russian and American dates seems evident, for he testified that he was buying Rubles, generally, at 1¢ below the New York market, and it is undisputed that the New York rate in December never went as high as 14¢.

(4) Four residents of Russia, Jofe, Agoeff, Carasso and Urchenko, testified to very small transactions, at prices ranging from 12.5 cents to 16¢, and even 20¢ per Ruble. These transactions were almost uniformly in Romanoff Rubles; and General Agoeff testified that Romanoff Rubles were worth twice as much as Duma Rubles and four times as much as Kerensky Rubles.

(5) The testimony of Charles S. Smith, an Associated Press representative at Petrograd, indicated that he settled his account with his employer at 13.3¢ per Ruble.

The receivers and the government produced contemporaneous records showing:

a. Sales of dollar drafts by the American Consulate General in Moscow: December 2 at 7.7¢; December 8, 8¢; December 8, 7¢; December 8, 1,150,000 Rubles at 10¢; December 15, 7.1¢; January 2, 7.1¢. Excepting the December 8th item, the transactions all involved small amounts.

b. Sales of dollar drafts by the United States Embassy at Petrograd: December 31, three sales, each at 7.1¢ per Ruble; December 31, sale to San Galli Grace and Co. at 10¢ pursuant to a prior arrangement.

c. Transactions in New York in Ruble currency (as distinguished from bank credits) imported from Japan at 7¢ and resold at 10¢.

 This evidence and some additional which I have omitted to mention must be subjected to several simple tests. The first is that not much credence can be placed after a lapse of twenty five years in transactions reported from memory, unassisted by contemporaneously written records or, at least, records made very shortly after the event. This is particularly true in a case where conflicting testimony can be reconciled by transposition of dates. The memory of 1943 is not a satisfactory guide for determining whether a minor transaction occurred in November or December, 1917. The second consideration is that, since value in Moscow and Petrograd is the ultimate fact to be ascertained, the debt being a Russian obligation, payable in Rubles, in Moscow and Petrograd, Dougherty v. Equitable Life Assurance Society, 1934, 266 N.Y. 71, 193 N.E. 897, evidence of New York prices is relevant only insofar as it throws light on value at Moscow and Petrograd. In normal times many factors, such as arbitrage transactions, tend toward a worldwide uniformity in exchange values. These factors operated at their minimum effect, if at all, during the turbulent days of December, 1917. A third consideration is the effect to be given to the relationship between the value of Ruble currency and Ruble exchange or bank credit. There is agreement that Ruble currency sold for considerably less than Ruble exchange. Indeed, defendant emphasizes the fact that plaintiffs' low-value testimony is based on currency transactions and defendant's witnesses, notably McClean and Atkins, have emphasized the lack of any relationship between currency prices and exchange prices, each being governed by its own supply and demand and its own cost of handling. The obligation of Russo-Asiatic to Guaranty could, however, be discharged by the payment of currency; and the same is true of the other Russian banks. So far as the contract of deposit is concerned, I suppose the depositor could always insist ∼ω currency or legal tender and must al-

ways be content with such mode of payment. No different Russian law has been proved. Consequently, this is not a case where the debtor has an election which after default passes to the creditor. Cf. Prudential Insurance Co. v. Faulkner, 10 Cir., 1934, 68 F.2d 676, 679, 94 A.L.R. 1160.

My conclusion is that at or about December 27, 1917, the value of the Ruble in terms of dollars ranged between 7¢ and 10.5¢ and that in appraising the value of the very large Ruble balance which the Guaranty claims, the average of the lower and upper figures is as close as I can come to a single quotation. I, therefore, find that the defendant's Ruble claims are to valued at 8.75¢ per Ruble.

It is of some interest that on February 18, 1918, the Soviet Government issued a decree fixing the value of the Ruble in terms of gold which calculates out at a value of 8.86¢ per Ruble.

 The defendant advances the argument that the Soviet Government, the assignor of the United States, "carried out the confiscations immediately responsible for defendant's losses and did so for the deliberate purpose of destroying money values and depressing the exchange rate at which defendant's Ruble balances would be computed". It argues that the last rate fixed by the Kerensky Government, namely, 15.84¢ per Ruble, should govern its claim. First, I find the evidence offered in support of the alleged fact, a political article read at the Third Congress of the Communist International in 1921, insufficient to sustain so broad an inference and moreover, even if such were the fact it would not avail the defendant. The pursuit of a policy of avowed monetary depreciation by a state is an act of state. It is not subject to the kind of scrutiny which the defendant's position would demand. Norman v. Baltimore & Ohio R. R. Co., 1935, 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352; King v. International Trustee [1937] A.C. 500; Wulfsohn v. Russian Socialist Federated Soviet Republic, 1923, 234 N.Y. 372, 138 N.E. 24; Salimoff & Co. v. Standard Oil Co., 1933, 262 N.Y. 220, 227, 186 N.E. 679, 89 A.L.R. 345.

### The Ministry of Finance Account.

On February 25, 1918, the defendant consolidated its Russian accounts under an account entitled "Russian Government Account". Therein it lumped all claims

of Guaranty against all Russian banks and institutions and all claims of Russian banks against it,[5] and showed itself a creditor on net balance, after effecting very substantial revaluations in the Ruble account.

Among the entries thus consolidated was a balance of $5,001,849.79, standing to the credit of the Foreign Section of the Ministry of Finance of the Russian Government, in an account opened in July, 1916, during the regime of the Csar. In August, 1934, the United States, as assignee under the Litvinov Assignment, brought an action to recover the balance of this account but its claim was defeated on the ground that it was barred by the statute of limitations; 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224; 2 Cir., 100 F.2d 369.

Defendant assigns four reasons why, in calculating its claims for purposes of a set-off in this action, the Ministry of Finance account should not be included.

1. It having been held that the United States is without a remedy with respect to that account, it should not be permitted indirectly to obtain the benefit of the account which it could not recover directly.

2. The assets and liabilities of the Russian banks passed through the State Bank before reaching the Soviet Government and since the State Bank was a separate entity "to some extent at least" the set-off operated, first, upon the Russo-Asiatic balance before it reached the Ministry of Finance account.

3. Other litigation is pending with respect to the Ministry of Finance account which prevents the application of the doctrine of marshalling.

4. Defendant's application of the balance to the very purpose of paying its claim against Russian banks must be read in the light of all the entries in the account which show a net balance owing to defendant. Since defendant has lost money on its Ruble business, having incurred an average cost for Rubles of 20.231¢, it will not be unjustly enriched by retaining both the Russo-Asiatic balance as well as the Ministry of Finance balance.

On December 9, 1921, the defendant, through Mr. Charles H. Sabin, chairman of its board of directors, wrote to Mr. Hughes, Secretary of State:

"On December 2 you wrote in regard to a credit of five million dollars which is supposed to stand on the books of our company in favor of the Government of Russia, and I am pleased to supply you with the facts in connection with this matter.

"The account was opened directly by the Russian Imperial Government and the balance at the time of the fall of the Kerensky Government was about $5,000,-000. * * *.

"Shortly after coming into power the Soviet Government took over and merged into the government treasury all banks in Russia, thereby confiscating their property and all balances therein, including those in favor of this Trust Company, representing in value over eight million dollars. As soon as we learned of this seizure early in 1918, we, on advice of counsel, applied the deposit account of the Russian Government with us as a partial offset against the greater amount due to us by the Russian Government through seizure of our property. * * *."

This letter makes explicit what is implicit in the consolidated account of February 25, 1918. The account and letter both left no doubt that the present argument of separate identity between State Bank and Soviet Government is an afterthought. If the set-off be treated as having been executed in 1918, then it is clear by defendant's own records and admissions that it applied the Ministry of Finance balance to pay itself, pro tanto, its claims against the Russian Government. If the set-off be treated as not having been executed by self-help but as a right which is being asserted in this action, then by defendant's own statement the Soviet Government succeeded to the rights of the State Bank as long ago as January 19, 1920.

The fact that in an action for recovery of that very balance the United States was defeated by the bar of the statute of limitations is quite irrelevant. The United States is not here asserting a counterclaim for the fund. Van Ness v. Kenyon, 1913, 208 N.Y. 228, 236, 101 N.E. 881, Ann.Cas.1914D, 221; Otto v. Lincoln Savings Bank, 268 App.Div. 400, 51 N.Y.S. 2d 561. It is the defendant which is asserting a set-off to an unbarred claim of the United States. In assessing the amount of its claim, which may be used for the set-off, the defendant may not equitably include claims which, by its own admissions, have been paid.

---

[5] Except claims of certain non-Russian branches of Russo-Asiatic, amounting to about $300,000.

The force of these admissions is not mitigated by the fact that they are coupled with a claim for a net balance in favor of defendant. That claim is the result of defendant's arithmetic. Had the defendant made an error in calculating the sum of the figures on the account, and thus produced a net balance in its favor, it could not be successfully argued that thereby the force of its admission was dissipated. Neither can the argument be successfully made where the defendant's error consists in applying the wrong factor to represent the value of Ruble exchange. And see, Wheeler v. Millar, 1882, 90 N.Y. 353.

The litigation to which defendant refers is Miller v. Guaranty Trust Co., pending in this court. Whatever claims the plaintiff in that case may assert is quite immaterial in the present posture of the case at bar. The doctrines of marshalling have no true bearing upon these issues. The defendant asserts that it has either executed or is entitled to execute a set-off. And the question is how much does Russia owe the defendant. By its own accounts, the defendant has established that it has paid itself part of its claims against Russia by retaining a sum in excess of $5,000,000 which it has expressly applied to the payment of its claims pro tanto. That it may have to defend other litigation in which issues relating to this account may be involved does not change the facts as developed upon this trial. Guaranty does not profess to be a stakeholder with respect to this fund, subject to multiple claims. It asserts its legal caption of the $5,000,000 and it denies the claims asserted by Miller. Under such circumstances I see no reason why the Guaranty's set-off should not reflect the fact that it has paid itself $5,000,000 on account of the claims it asserts.

### III. The Intervenors.

The intervenor James A. Tillman is an alleged creditor of Russo-Asiatic Bank, who obtained issuance of a warrant of attachment out of the Supreme Court of the State of New York on August 22, 1927, in an action against Russo-Asiatic Bank. On September 23, 1935, he obtained a default judgment in the Supreme Court, Queens County, for $210,675.05. His claim arose out of the alleged dishonor of a check drawn by him for 72,000 Rubles on Russo-Asiatic Bank, Petrograd, on September 18, 1918 and included additional claims assigned to him by Russian nationals in 1927. Intervention in the equity suit was effected on March 9, 1936, pursuant to an order of this court.

On December 29, 1939, Tillman filed a claim with the receivers founded upon the same judgment.

Had the receivers prevailed in their action, Tillman could not have judgment in this action but would be relegated to his claim in the receivership. Civil Practice Act, § 977-b (16); Walling v. Miller, 1888, 108 N.Y. 173, 15 N.E. 65, 2 Am.St. Rep. 400. The receivers having failed, the question, whether the filing of his claim with the receivers constitutes a waiver of his claim in this court, is not presented. Cf. Alexander v. Hillman, 1935, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192; Re City Bank of Buffalo, 1843, 10 Paige 378, 382; Farmers Loan & Trust Co. v. Bankers & Merchants Telegraph Co., 83 Hun. 560, 31 N.Y.S. 1096, affirmed, °1896, 148 N.Y. 315, 324, 42 N.E. 707, 31 L.R.A. 403, 51 Am.St.Rep. 690.

Tillman is beset by procedural difficulties. Since he is seeking to satisfy a judgment resulting from an action in which defendant did not appear and jurisdiction of which was founded upon an attachment, he may do so only out of property levied upon and coming into the possession of the sheriff. Civil Practice Act New York, § 520; McCarthy v. Culken, 1930, 254 N.Y. 328, 172 N.E. 524; Cotnareanu v. Chase National Bank, 1936, 271 N.Y. 294, 2 N.E.2d 664; Sturcke v. Link, 1941, 176 Misc. 93, 26 N.Y.S.2d 748. To reduce attached property to the sheriff's possession, the Civil Practice Act provides two remedies: An action by the sheriff under § 922, or an action by the attachment creditor and the sheriff jointly under § 943. The latter remedy has already been resorted to by Tillman but was found unavailing because barred by the statute of limitations. Tillman v. National City Bank & Guaranty Trust Co., 1938, 276 N.Y. 663, 13 N.E.2d 52.

Regardless of these difficulties and regardless of the fact that Tillman did not intervene in the law actions instituted by the United States as plaintiff, the question still remains whether his attachment is a "preexisting infirmity," subject to which the United States received under the Litvinov Assignment or whether, by its very terms, the Litvinov Assignment ex-

cluded the attached funds from the transfer to the United States.

To determine that question we must consider the facts as they stood on November 16, 1933, the date of the assignment. It appears to me that on that day no attachment was in effect against any property of Russo-Asiatic in the hands of Guaranty Trust; that there was, therefore, no pre-existing infirmity in the assignment to the United States of the claim of the Soviet Government against Guaranty; and that the exceptive provisions of the Litvinov Assignment did not come into play. These conclusions follow from the facts about to be recited which are not disputed.

Tillman first commenced his action against Russo-Asiatic Bank in 1927 and procured from the New York Supreme Court a warrant of attachment and caused a levy to be made upon the debt due from Guaranty to Russo-Asiatic. Thereafter, the cause was removed to the Federal Court, Eastern District of New York. In that court, an order was made on June 26, 1928, with the consent of Tillman's attorney, vacating the attachment. A verdict having been rendered against Tillman and judgment entered thereon, Tillman appealed to the Circuit Court of Appeals which affirmed as to one cause of action, and held that the Federal Court was without jurisdiction as to the second cause of action and ordered its remand to the state court from which it had been removed; 51 F.2d 1023, 80 A.L.R. 1368, certiorari denied, 285 U.S. 539, 52 S.Ct. 312, 76 L.Ed. 932. After the remand to the state court, the Russo-Asiatic Bank caused to be entered, by the attorney appearing for it, an order, based upon the prior consent of Tillman's attorney, vacating the attachment. This order was affirmed by the Appellate Division and the New York Court of Appeals.

Not until July 13, 1935, did the Supreme Court of Kings County enter an order striking out the appearance of Russo-Asiatic's attorney, nunc pro tunc, as of November 26, 1927, and vacating the state court order which had vacated the warrant of attachment. The United States was not a party to these proceedings. Thereafter, on December 23, 1935, the default judgment, which is the foundation of Tillman's claim, was entered. In the meantime, however, the United States had acquired, by assignment from the Soviet Government, its right and title to the Russo-Asiatic balance at Guaranty at a time when it was not subject to any attachment and was, therefore, free of any infirmity.

The intervenor, James C. Millard, is the assignee of a claim of the Chinese Government, admits the allegations of the receiver's complaint and asks no affirmative relief in his favor. No judgment can be given in his favor; and consequently the cross-claim of Guaranty against Millard's assignor must likewise fail.

It follows that in the equity action, the complaints of the receivers and intervenors Tillman and Millard are to be dismissed; and the cross-claim of defendant against Millard is likewise dismissed; and that in the two actions at law, judgment is to be given in favor of the United States.