STATE OF RUSSIA v. NATIONAL CITY BANK OF NEW YORK et al.

Circuit Court of Appeals, Second Circuit.

Feb. 6, 1934.

Frederic R. Coudert and Mahlon B. Doing, Sp. Assts. to Atty. Gen., and W. S. Ward, of Washington, D. C., for the United States.

Coudert Brothers, of New York City (Frederic R. Coudert and Mahlon B. Doing, both of New York City, of counsel), for the State of Russia.

Shearman & Sterling, of New York City (Philip A. Carroll and Otey McClellan, both of New York City, of counsel), for defendant-appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This action, brought in the name of the state of Russia July 9, 1928, sought the recovery of a deposit in the National City Bank of New York. A decree for the defendant was entered October 11, 1933, and this appeal was taken by the state of Russia.

Mr. Serge Ughet, the financial attaché of the Russian Embassy under the Russian Provisional Government, in the name of the state of Russia, appealed from the decree October 14, 1933. On October 21, 1933, Mr. Ughet sent a letter to the Department of State expressing a desire to be relieved of his duties as a representative of the state of Russia, and, on November 15, 1933, he made an assignment of this cause of action to the United States. On November 16, 1933, the President of the United States established diplomatic relations with the Union of Soviet Socialist Republics as the de jure government of Russia. Mr. Maxim Litvinoff, the People's Commissar for Foreign Affairs of the Soviet Republics, assigned to the government of the United States the claim in suit and thus ratified the assignment of the claim in suit which had been made by Mr. Ughet. We judicially recognized Mr. Ughet as the financial attaché of the Russian Embassy in the United States. Lehigh Valley R. Co. v. State of Russia, 21 F.(2d) 396 (C. C. A. 2).

The deposit of money, in December, 1917, was in the Bankers' Trust Company in the name of three individuals, and was drawn from the general account of the Russian government and deposited with the National City Bank. These individuals were empowered to sign checks. They were officials of the Russian Railroad Commission in the United States appointed prior to the Soviet Revolu-

tion. It was a government account. In 1918 one of these same three officials had transferred allegiance to the Soviet government. The others arranged to transfer to the National City Bank the existing credit balance in the Bankers' Trust Company. Mr. Ughet obtained their check and deposited the same with the bank to a general account for the credit of the Russian government. The account, $115,788.32, remained there until July, 1928, under a special arrangement unnecessary to consider here. This action was then commenced.

Below it was agreed that the money is the sole and exclusive property of the Russian government, but that the government owes the National City Bank $4,435,000, evidenced by a promissory note dated May 1, 1917. The money was used to finance the purchase of railroad cars in the United States for the Russian government. Below the bank successfully offset its claim against the deposit.

The diplomatic letters exchanged, dated November 16, 1933, were as follows:

"The White House, Washington,
November 16, 1933.

"My Dear Mr. Litvinov:

"I am very happy to inform you that as a result of our conversations the Government of the United States has decided to establish normal diplomatic relations with the Government of the Union of Soviet Socialist Republics and to exchange ambassadors.

"I trust that the relations now established between our peoples may forever remain normal and friendly, and that our nations henceforth may cooperate for their mutual benefit and for the preservation of the peace of the world.

"I am, my dear Mr. Litvinov,
"Very sincerely yours,
"Franklin D. Roosevelt

"Mr. Maxim M. Litvinov, People's Commissar for Foreign Affairs, Union of Soviet Socialist Republics."

"Washington, November 16, 1933.

"My dear Mr. President:

"Following our conversations I have the honor to inform you that the Government of the Union of Soviet Socialist Republics agrees that, preparatory to a final settlement of the claims and counter claims between the Governments of the Union of Soviet Socialist Republics and the United States of America and the claims of their nationals, the Government of the Union of Soviet Socialist Repub-

lics will not take any steps to enforce any decisions of courts or initiate any new litigations for the amounts admitted to be due or that may be found to be due it, as the successor of prior Governments of Russia, or otherwise, from American nationals, including corporations, companies, partnerships, or associations, and also the claim against the United States of the Russian Volunteer Fleet, now in litigation in the United States Court of Claims, and will not object to such amounts being assigned and does hereby release and assign all such amounts to the Government of the United States, the Government of the Union of Soviet Socialist Republics to be duly notified in each case of any amount realized by the Government of the United States from such release and assignment.

"The Government of the Union of Soviet Socialist Republics further agrees, preparatory to the settlement referred to above not to make any claim with respect to:

"(a) judgments rendered or that may be rendered by American courts in so far as they relate to property, or rights, or interests therein, in which the Union of Soviet Socialist Republics or its nationals may have had or may claim to have an interest; or,

"(b) acts done or settlements made by or with the Government of the United States, or public officials, in the United States, or its nationals, relating to property, credits, or obligations of any Government of Russia or nationals thereof.

"I am, my dear Mr. President,
"Very sincerely yours,
"Maxim Litvinoff,
"People's Commissar for Foreign Affairs, Union of Soviet Socialist Republics.

"Mr. Franklin D. Roosevelt, President of the United States of America, The White House."

Since this exchange of notes, the state of Russia is no longer recognized by this government for any purpose. It may not appear as a litigant, neither on behalf of the assignee or otherwise. The assignee of the claim named in a legally sufficient assignment is now the proper party appellant. A motion is made by the United States as an assignee to be permitted to prosecute this appeal.

The appellee argues that the assignments by Ughet and Litvinoff are ineffectual, and that to bring the United States in as a party now requires a petition in the nature of a supplemental bill in the District Court. It

also maintains that the substance of the diplomatic notes of Mr. Litvinoff to the President is tantamount to an abandonment of the appeal.

The United States is in the nature of a corporate entity, and has a common-law right to acquire property. Fay v. United States, 204 F. 559 (C. C. A. 1); United States v. Rubin (D. C.) 227 F. 938. Therefore a lawful assignment to it is effective. One government may transfer property rights to another government. Hijo v. United States, 194 U. S. 315, 24 S. Ct. 727, 48 L. Ed. 994; Herrera v. United States, 222 U. S. 558, 32 S. Ct. 179, 56 L. Ed. 316.

While specific powers and duties of a secretary or minister for foreign affairs of a nation are generally prescribed and regulated by the municipal law of that nation at home, international law defines his position regarding intercourse with other nations. 1 Oppenheim International Law (3d Ed.) 1920, p. 538.

In United States v. De la Maza Arredondo, 6 Pet. 691, at page 728, 8 L. Ed. 547, the court said: "The grants of colonial governors, before the revolution, have always been, and yet are, taken as plenary evidence of the grant itself, as well as authority to dispose of the public lands. Its actual exercise, without any evidence of disavowal, revocation or denial by the king, and his consequent acquiescence and presumed ratification, are sufficient proof, in the absence of any to the contrary (subsequent to the grant), of the royal assent to the exercise of his prerogative by his local governors. This or no other court can require proof that there exists in every government a power to dispose of its property; in the absence of any elsewhere, we are bound to presume and consider, that it exists in the officers or tribunal who exercises it, by making grants, and that it is fully evidenced by occupation, enjoyment and transfers of property, had and made under them, without disturbance by any superior power, and respected by all co-ordinate and inferior officers and tribunals throughout the state, colony or province where it lies. A public grant, or one made in the name and assumed authority of the sovereign power of the country, has never been considered as a special verdict; capable of being aided by no inference of the existence of other facts than those expressly found or apparent by necessary implication. * * * *"

The minister of foreign affairs in his public character is the regular political intermediary between the state and foreign government. He has plenary authority to represent his state at conference and diplomatic negotiations. 3 Genet, Traite de Diplomatic et de Droit Diplomatique 1932, 162; Hall, Treatise on International Law (6th Ed. by Atlay) p. 295.

If the minister is commissioned to undertake special negotiations of a public character which require his presence in a foreign jurisdiction, he must and usually is furnished with powers to negotiate. The powers may be embodied either in an ordinary letter of credence or in special letters patent. These powers within reasonable limits define the authority for his acts, which acts will be binding upon his government. Hall, Treatise on International Law (6th Ed. by Atlay) p. 295. While no authority has been found, respecting the principle of public international law or national policy, which conflicts with the recognition in the minister for foreign affairs of a nation of the power to alienate the proprietary rights or interests of his nation by the execution of an assignment in his name, still there are here sufficient reasons upon which we may conclude presumptively that he had such powers.

As to the authority of Foreign Commissar Litvinoff to make the assignment on behalf of his government, there is a presumption of authority in his designation, recognition, and the President's acceptance of the assignment. It is a matter of political action in foreign affairs, and the question of who represents and acts for a sovereign or nation in its relation to the United States is determined, not by the Judicial Department, but exclusively by the political branch of the government. Lehigh V. R. Co. v. State of Russia, supra; Doe ex dem. Clark v. Braden, 16 How. 635, 656, 14 L. Ed. 1090; Hyde on International Law, Vol. 1, p. 368; Terlinden v. Ames, 184 U. S. 270, 288, 22 S. Ct. 484, 491, 46 L. Ed. 534. In Terlinden v. Ames, supra, the court said: "In Doe ex dem. Clark v. Braden, 16 How. 635, 656, 14 L. Ed. 1090, where it was contended that so much of the treaty of February 22, 1819 ceding Florida to the United States, as annulled a certain land grant, was void for want of power in the King of Spain to ratify such a provision, it was held that whether or not the King of Spain had power, according to the Constitution of Spain, to annul the grant, was a political, and not a judicial, question, and was decided when the treaty was made and ratified."

Quoting Chief Justice Taney, it was said: " 'And it would be impossible for the Executive Department of the government to conduct

our foreign relations with any advantage to the country, and fulfill the duties which the Constitution has imposed upon it, if every court in the country was authorized to inquire and decide whether the person who ratified the treaty on behalf of a foreign nation had the power, by its Constitution and laws, to make the engagements into which he entered.' "

Our courts must accept the assertion of the government of the United States as to the effect of an assignment. Jones v. United States, 137 U. S. 202, 11 S. Ct. 80, 34 L. Ed. 691; Williams v. Suffolk Ins. Co., 13 Pet. 415, 10 L. Ed. 226. Nor is the acceptance of this assignment a treaty in any formal sense. It is clearly within the exclusive powers of the executive and is known as an executive agreement. An ambassador to Russia was appointed by the President, and his appointment confirmed January 11, 1934, by the Senate, and in the debate of the Senate it is said that valid agreements have been "reached between the President and the Representatives of the Russian Soviet Union upon which the recognition of the Soviet Government is based," founded upon the exclusively "executive function and prerogative to recognize foreign governments," and there was mentioned "the basis of contractual relationship upon which recognition has been granted. * * * " Congressional Record, vol. 78 (Jan. 11, 1934) p. 440.

The President of the United States is intrusted with the right of conducting all negotiations with foreign governments and is the judge of the expediency of instituting, conducting, or terminating such negotiations in respect to claims against foreign governments. Agreements of such adjustment or settlement of such claims are not submitted to the Senate. J. B. Moore, Treaties and Executive Agreements, Political Science Quarterly, vol. 20, p. 385; Moore's International Law Digest, vol. 5, § 752.

The government of Russia is the agent of the state. Lehigh V. Ry. Co. v. State of Russia, supra. The solicitors representing this application prosecuted the suit below and were recognized by the agent of the plaintiff. They have now been appointed Special Assistants to the Attorney General of the United States to carry on this appeal. This is sufficient authorization for them to appear.

The authority of the United States of America, after the lawful assignment, to proceed in this court, is fully established. F. A. Mfg. Co. v. Hayden & Clemons, Inc., 273 F. 374 (C. C. A. 1).

The Litvinoff letter refers to "the amounts admitted to be due or that may be found to be due it [the Soviet Govenment] * * * from American nationals," and states that the Soviet government "will not object to such amounts being assigned and does hereby release and assign all such amounts to the Government of the United States. * * * " This sufficiently, for an assignment, covers the claim alleged to be due, the subject of the appellant's suit. The acknowledgment of the Soviet government further was "not to make any claim with respect to: (a) judgments rendered or that may be rendered by American courts. * * * " This phrase does not mean that the United States shall not continue an appeal already taken from the decree below. The appeal of the cause of action in suit had already been perfected when this assignment was made, and further action respecting it was then a subject for the consideration of the government of the United States and not of the Soviet government. There is no undertaking upon the part of the United States not to prosecute this appeal, and the rights to be obtained by this appeal belong to the United States by virtue of the assignment. Neither party to the exchange of diplomatic notes intended waiving rights of appeal, for they did not say so. Moreover, it is apparent that the intent was to assign all the claims of the Soviet government to the United States, and it agreed to leave undisturbed diplomatically final nonappealable judgments and decrees of the American courts touching Russian affairs and nonjudicial acts done in good faith by and with the officials of the previously recognized government of Russia. This we think was the intention on the part of the governments as stated in this exchange of correspondence. It cannot be that the parties intended to prevent an appeal, the claim of which had been assigned and which was lodged against a third party.

Motion granted.