**UNITED STATES v. NEW YORK TRUST CO. et al.**

**Nos. L59–81, L68–266.**

District Court, S. D. New York.

Feb. 4, 1946.

584

John F. X. McGohey, U. S. Atty. for the Southern Dist. of New York, of New York City (Francis M. Shea, Asst. Atty. Gen., and John F. Sonnett, Acting Head, Claims Division, and Paul A. Sweeney, Atty. Dept. of Justice, both of Washington, D. C., Daniel M. Sandomire, Alexander N. Sack, Howard N. Meyer and Lester S. Jayson, Sp. Attys., Dept. of Justice, all of New York City, of counsel), for plaintiff.

White & Case, of New York City (Chester Bordeau, of New York City, of counsel), for defendant, New York Trust Co.

Morris F. Goldstein, of New York City (Abraham P. Insel, of New York City, of counsel), for impleaded defendant Radin.

Samson Selig, of New York City, for impleaded defendants Gordon and Quinn.

LEIBELL, District Judge.

This is another case involving claims to funds deposited with a New York bank by a Russian corporation, which was later nationalized by the Soviet government. Most of the facts have been stipulated.

Two actions were brought by the United States government against the New York Trust Company. In one action (L 59–81) commenced September 21, 1934, the government claimed the balances standing to the credit of Vladikavkazsky Railway Com-

pany on the books of the New York Trust Company in two accounts, $46,584.18 and $11,680. In the second action (L 68–266) commenced November 4, 1937, the government claimed from the New York Trust Company a balance of $20,494.92 standing to the credit of Vladikavkazsky Railway Company. The Trust Company answered claiming a set-off or counterclaim and impleaded three claimants, Gordon, Radin, and Quinn the Receiver. Gordon and Quinn filed answers which set forth their claims. Radin defaulted but at the trial was permitted to answer and participate as a litigant. Radin's answer was similar to Gordon's and set forth the factual basis of Radin's claims. Replies filed by the United States and the New York Trust Company challenged the legal sufficiency of the Gordon, Radin and Quinn claims.

The defendant, New York Trust Company, on May 12, 1937, deposited with the Clerk of this Court the balances in the said three accounts, totalling $78,759.10, which stood to the credit of the Vladikavkazsky Railway Company on the books of the trust company in 1927, when they were transferred to a reserve account. The two actions were consolidated for trial by an order dated March 3, 1938. On stipulation of the parties, except Radin, an order was entered July 15, 1938, that all claims against the New York Trust Company with respect to the three accounts be satisfied out of the fund deposited with the Clerk, without prejudice to claims for further principal or interest. But at the trial the correction of the principal amount was conceded and claims of interest were waived.

The United States government claims these funds under the Litvinov assignment of November 16, 1933. Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224; United States v. Pink, 315 U.S. 203, 225, 67 S.Ct. 552, 86 L.Ed. 796. The New York Trust Company claims them by way of set-off against $565,000 principal amount of Russian (Provisional) Government 5% Treasury notes, purchased by the Trust Company on January 27, 1925 and April 6, 1925, from New York banking and brokerage houses for a total cost of $57,-206.25. These notes had been issued by the Russian (Provisional) Government dated as of May 1, 1917 and were payable at the National City Bank of New York. They were declared annulled by the Soviet Government on January 21, 1918.

Impleaded defendants Radin and Gordon made their demands upon the balances of the Vladikavkazsky Railway Company, held by the New York Trust Company, through warrants of attachment issued out of the New York Supreme Court on March 17, 1934 and August 25, 1934, for $3,758 and $142,294.31 respectively. The claims are based on bonds of the Railway Company and the former Russian Government's guarantee of the bond interest. Impleaded defendant Quinn made his demands upon the same funds, as temporary receiver of the Railway Company's assets in New York, having been appointed by the New York State Supreme Court July 21, 1936 under Civil Practice Act, § 977-b, in an action instituted by Gordon.

I have reached the conclusion that the United States of America is entitled to these funds.

### Discussion.

By the nationalization decree of June 28, 1918 the Russian Socialist Federated Soviet Republic (at that time not recognized by the Government of the United States) declared all the property of private railway companies to be "the property of the Russian Socialist Federated Soviet Republic". The Soviet Commissariat of Justice has the power to interpret existing Russian law. It was so held in United States v. Pink, 315 U.S. 203, 62 S. Ct. 552, 86 L.Ed. 796. Mr. Justice Douglas, in his opinion stated (315 U.S. at page 220, 62 S.Ct. at page 560, 86 L.Ed. 796): "The referee in the Moscow case found, and the evidence supported his finding, that the Commissariat for Justice has power to interpret existing Russian law. That being true this official declaration is conclusive so far as the intended extraterritorial effect of the Russian decree is concerned".

The Commissariat of Justice on April 18, 1924 issued the following interpretation of the nationalization decree of June 28, 1918. "According to the meaning of the decree of SNK (Council of People's

Commissars) of June 28, 1918 (Collection of Laws, No. 47, Section 559) the assets of former private enterprises, which had passed into the ownership of the State, must be considered nationalized, even if they had been placed abroad. This follows from the first part of the decree of June 28, 1918. 'To declare industrial and commercial-industrial enterprises with all their assets and properties, of whatever such may consist, the property of the Russian Socialist Federated Soviet Republic.' No exception is made in this decree for assets placed abroad. Therefore, there is no basis not to consider these assets, as well, nationalized."

Additional interpretations issued by the Commissariat of Justice on August 9 and November 28, 1937, reaffirm the above quoted interpretation of the scope of the nationalization decree. Any other interpretation is unwarranted. As Judge Rifkind stated, in Steingut v. Guaranty Trust Co. (United States v. Guaranty Trust Co.,) D.C., 58 F.Supp. 623, 632: "To deny the Russian decree an intention to reach extra-territorial assets is to ascribe to the Russian law makers a purpose to bestow those assets upon anyone except Russians. That is a construction which is hardly to be favored".

■ At the time the nationalization decree of June 28, 1918 was issued, the Soviet government was not officially recognized by the Government of the United States, but the subsequent recognition of the Soviet government on November 16, 1933, had a retroactive effect upon such decrees of the Soviet government, rendering them valid from the time of issuance.

In United States v. Belmont, 301 U.S. 324, 330, 57 S.Ct. 758, 760, 81 L.Ed. 1134, the Court stated: "We take judicial notice of the fact that coincident with the assignment set forth in the complaint, the President recognized the Soviet government, and normal diplomatic relations were established between that government and the government of the United States, followed by an exchange of ambassadors. The effect of this was to validate, so far as this country is concerned, all acts of the Soviet government here involved from the commencement of its existence. The recogni-

tion, establishment of diplomatic relations, the assignment, and agreements with respect thereto, were all parts of one transaction, resulting in an international compact between the two governments. That the negotiations, acceptance of the assignment and agreements and understandings in respect thereof were within the competence of the President may not be doubted". See, also, United States v. Pink, 315 U.S. 203 at page 223, 62 S.Ct. 552, at page 562, 86 L.Ed. 796.

■ Title to the funds in question, originally belonging to the Railway Company, passed by virtue of the nationalization decree of June 28, 1918 to the Soviet Government, and then to the Government of the United States under the terms of the Litvinov assignment of November 16, 1933.

■ We now come to a determination of the claimed right of New York Trust Company to set-off against the claim of the United States Government (as assignee of the Soviet Government) the amount due on the 5% Treasury notes of a pre-Soviet Russian Government, purchased by the New York Trust Company in January 1925. The Litvinov Assignment of November 16, 1933 passed no greater rights to the United States Government than were held by the Soviet Government at the time of the assignment; the position of the assignee is no stronger than that of its assignor. "For the United States acquired under the Litvinov Assignment only such rights as Russia had. Guaranty Trust Co. v. United States, 304 U.S. 126, 143, 58 S.Ct. 165, 793, 82 L.Ed. 1224". United States v. Pink, 315 U.S. 203, 217, 62 S.Ct. 552, 559, 86 L. Ed. 796. In deciding the merits of the Trust Company's claim to the funds, we must consider the Trust Company's rights against the Soviet Union, prior to the Litvinov Assignment.

Let us assume that instead of assigning its claim to the United States Government on November 16, 1933, the Soviet Government on that date instituted a suit in this Court against the New York Trust Company for the $78,759 standing to the credit of Vladikavkazsky Railway Company on the books of the Trust Company. The Soviet Government's title to those deposits

would be good, according to United States v. Belmont, supra. In such a suit the Trust Company could not have set-off any claim based on the $565,000 principal amount of 5% notes issued by the Russian (Provisional) Government, dated as of May 1, 1917, purchased by the Trust Company January 27, 1925, because the notes and the claims based thereon are unrelated to the bank deposits and the transaction through which the deposit credits were created.

The set-off which may be asserted against a sovereign, is in reality a claimed recoupment and is "in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's (the sovereign's) action is grounded". Bull v. United States, 295 U.S. 247 at page 262, 55 S.Ct. 695, at page 700, 79 L.Ed. 1421; quoted in Re Monongahela Rye Liquors, Inc., 3 Cir., 141 F.2d 864, 869. If the claimed set-off to the suit by the sovereign is based "upon matter unrelated to the primary claim", it is "the equivalent of an independent suit against the sovereign, which, of course, may not be sued without its consent". Monongahela Rye Liquors, (supra). In Kingdom of Roumania v. Guaranty Trust Co., D.C., 250 F. 341, 343, Ann.Cas.1918E, 524; certiorari denied, 246 U.S. 663, 38 S.Ct. 333, 62 L. Ed. 928, the rule was stated as follows: "It is the long-accepted law that a foreign sovereign cannot be sued nor his property attached in the courts of a foreign friendly country without his consent. (Citing cases.) Nor can the defendant when sued by a foreign sovereign avail himself of any counterclaim or set-off except perhaps a set-off arising out of the same transaction."

The case of United States v. National City Bank, 2 Cir., 83 F.2d 236, is not to the contrary. In that case the notes of the Russian Government were payable at the bank where it kept its money on deposit, which the Court held (83 F.2d at page 239) "was equivalent to an order to pay the same from the account of the debtor". The Court concluded that the claim on the notes could be set off by the Bank against the claim of the Russian Government for its deposits (the United States as assignee was substituted on the appeal, State of Russia v. National City Bank of New York 2 Cir., 69 F.2d 44) because the set-off against the sovereign arose out of the same transaction on which the sovereign's claim was based.

There is no similar situation in the case at bar. The bank deposits stood in the name of the Railway Company. They were in no way related to the notes of the Russian (Provisional) Government. The notes were payable at a different bank, The National City Bank. The funds of the Railway Company in the New York Trust Company were never intended to be used in the payment of any part of the principal or interest of the notes. Disregarding the Soviet Government's repudiation of the notes as obligations of a predecessor Russian Government, and the Soviet's annulment of such obligations by its decree of January 21, 1918, and assuming that the New York Trust Company had a valid legal claim against the Soviet Government based on these notes, nevertheless the Soviet's sovereign immunity would be a shield against the enforcement of the Trust Company's claim. Sovereign immunity is based on international law and it may be asserted even by an unrecognized government. Wulfsohn v. Russian Republic, 234 N.Y. 372, 138 N.E. 24.

When we speak of a right of set-off against the claim of a sovereign we mean the assertion of the defense of recoupment which "sprang from a violation by the plaintiff of a legal right of the defendant created by the contract or transaction upon which the suit was brought and might not be a demand independent of such contract or transaction; it was a rule of the common law and not the creation of a statute". Seibert v. Dunn, 216 N.Y. 237, at page 240, 110 N.E. 447, at page 448. Recoupment "is not a set-off or counterclaim in the strict sense, because it is not in the nature of a cross demand, but rather it lessens or defeats any recovery by the plaintiff. It goes to the existence of plaintiff's claim, and is limited to the amount thereof". Pennsylvania R. Co. v. Miller, 5 Cir., 124 F.2d 160, at page 162, 140 A. L.R. 811.

588

■ The alleged set-off of the Trust Company is an attempt to graft upon the Government's claim a counterclaim which took root in different facts and circumstances. It was an entirely separate and distinct transaction and had nothing to do with the contractual obligation of the Trust Company to pay the balance of its depositor on demand. There is no question of a "bankers lien" here involved. The notes were not payable at the New York Trust Company. The Trust Company bought the notes in January 1925, not from the Soviet government but from New York banking and brokerage houses. The notes thus purchased did not represent any indebtedness of the depositor contracted in the course of the depositor's dealing with the Trust Company, which would give the Trust Company the right to appropriate the funds of the depositor to the payment of the indebtedness. A so-called bankers lien is based upon the law of set-off, counterclaim, recoupment, or kindred rules. Jordan v. National Shoe & Leather Bank, 74 N.Y. 467, 30 Am.Rep. 319. See, also Bank v. Brewing Co., 50 Ohio St. 151, 33 N.E. 1054, 40 Am.St.Rep. 660, and In re Wilkins' Will, 131 Misc. 188, 226 N.Y.S. 415, 425. Unless the set-off is in fact a recoupment, as explained above, the claimed bankers' lien against the plaintiff is unenforceable under the rule of sovereign immunity. I have therefore concluded that even as against the Soviet government, prior to its recognition by the United States and prior to the Litvinov Assignment, the New York Trust Company could not have set-off against the Soviet claim to the three deposit accounts, any claim based upon these notes of a predecessor Russian government.

■ It follows that the right of the United States of America to the deposits, under the Litvinov Assignment of November 16, 1933, should be sustained and the claim of the New York Trust Company to a set-off dismissed.

■ As to Radin, and Gordon, and Quinn the receiver, they are entitled to have this Court determine the validity of their claims to the fund. However, they took no action to gain possession of the fund, as alleged assets of the Railway Company, until after title thereto had vested in the United States of America, through the Litvinov Assignment. Further, there are certain defects in the claims and proceedings of Radin and Gordon, which will now be discussed.

■ Both Radin and Gordon sued the Vladikavkazsky Railway Company in the New York State Supreme Court (Radin in New York County and Gordon in Richmond County) in 1934 and sought warrants of attachment. Their claims were upon bonds of the Railway Company. Gordon claimed for unpaid interest, as the assignee of Zahle, a Dane; Radin claimed for the principal and interest of two $1,000 bonds, as assignee of Blaser, an American. Gordon sued out a warrant of attachment August 25, 1934, which was served on the New York Trust Company by the Sheriff of New York County. The publication of the summons was completed in the Gordon action, but nothing further was done. The warrant of attachment was served on the New York Trust Company in the Radin action on March 17, 1934 by the Sheriff of New York County but the publication of the summons required by the New York Civil Practice Act was never completed, so that the attachment became invalid ab initio. N. Y. Civil Practice Act, Sec. 905. Eriksson v. Refiners Export Co., 290 N. Y. 713, 49 N.E.2d 1001. In a second action by Gordon (in New York County) Quinn was appointed temporary receiver of the assets of the Railway Company in New York, on July 21, 1936 (N. Y. Civil Practice Act, § 977-b) and he qualified as such receiver. A week later he demanded from the New York Trust Company any moneys due the Railway Company. He has not come into possession of any assets, nor did the Sheriff actually obtain anything under the two attachments aforementioned. The deposits became the property of the United States November 16, 1933.

The claims of Gordon and Radin are based upon bonds of the Railway Company, containing a clause that "This loan is secured by the whole of the property and the entire receipts of the Company, and possesses the same rights as the loans pre-

viously issued". Gordon and Radin assert a lien on these funds under that clause. However, it has been interpreted by the Russian courts to mean that the security intended is not that of a mortgage, but that the bonds would enjoy a preference in bankruptcy as against any other private debt obligations of the Railway Company. [Pltfs. Ex. 30-A] The bond provision did not give rise to any sort of lien against the bank deposits while they were still the property of the Railway Company. After the deposits became the property of the Soviet government no lien could be created and enforced against the sovereign, the Soviet government.

The defendant Radin urges that the Supreme Court has not yet ruled on the question of the right of the United States to property assigned under the Litvinov Assignment, as against the claims of local New York creditors in respect to assets within this state. We might add "and against receivers appointed to administer and distribute the property to such creditors and other claimants", as Judge Rifkind stated in Steingut v. Guaranty Trust Co., D. C., 58 F.Supp. 623 at page 633. Judge Rifkind analyzed the provisions of § 977-b of the New York Civil Practice Act and demonstrated that its provisions were in direct conflict with the purposes of the national government under its November 1933 agreement with Russia, as explained in United States v. Pink, 315 U.S. 203, 225, 62 S.Ct. 552, 86 L.Ed. 796. I quote the following from Judge Rifkind's opinion (58 F.Supp. at page 634): "Manifestly, New York policy is not globular, is not designed to eliminate obstacles to friendly relations between the two nations, and erects a system of its own for the collection and distribution of the Russian assets. What New York can do every state can do; and in so doing, it is clear that 'the power of recognition might be thwarted or seriously diluted.' [United States v. Pink], 315 U.S. at page 230, 62 S.Ct. at page 565, 86 L.Ed. 796. To summarize: by means of § 977-b and the orders made herein, New York has gone beyond the establishment of a device for the protection of its citizens who are creditors of Russo-Asiatic or of those who did business with it in New York; it has established a complete system of administration founded upon a policy of nonrecognition of the Russian nationalization decrees insofar as New York assets are concerned. Enforcement of this policy 'would collide with and subtract from the Federal policy'; Id., 315 U.S. at page 231, 62 S.Ct. at page 566, 86 L.Ed. 796. It must, therefore, yield."

The decision in the Steingut v. Guaranty case disposes of the contentions made for the defendant Quinn, a receiver appointed under § 977-b.

The Gordon claim is not really the claim of a New York creditor. Gordon is only an assignee for purposes of collection; the claim assigned to her is that of a Danish citizen, Holger Zahle, who is the real party in interest. Any policy of the State of New York designed to favor purely local creditors, would not apply to the Gordon claim. Nor could Zahle a foreign creditor of the Railway Company bring himself within one of the purposes of the Litvinov Assignment, which was intended in part to secure American held claims against Russia and its nationals. As to Ethel Radin, she is a nominee of Fred Blaser, an American citizen and a resident of New York. He would be favored under any policy of the State of New York to prefer local creditors. But he has slept on his rights, as above indicated. I believe that any such state policy must yield in a situation such as this to the paramount policy of the federal government, which is a national policy designed to pool all the assets recovered under the Litvinov Assignment in the interest of all American creditors, regardless of their residence in a State in which certain of the assigned assets are located. That is the fair way of dealing with a national and not a local problem. The New York Trust Company and Blaser, American citizens, may some day share in the assets received by their government under the Litvinov Assignment. Zahle, a foreign citizen, will have to look to his own government for assistance in another forum, or through other channels. Meanwhile the funds involved in this action

will be ordered paid to the United States as the claimant legally entitled thereto. Submit decree in accordance with the conclusions of law hereinabove set forth.