UNITED STATES v. NATIONAL CITY BANK OF NEW YORK et al.

STEINGUT et al. v. NATIONAL CITY BANK OF NEW YORK.

United States District Court
S. D. New York.
May 5, 1950.

Irving H. Saypol, United States Attorney, New York City, for the United States. Samuel M. Lane, Special Assistant to the Attorney General, Leanora S. Gruber, New York City, Herman Marcuse, New York City, of counsel.

Halperin, Natanson & Scholer, New York City, for the receivers. Albert R. Connelly, Samuel L. Scholer, Samson Selig, L. D. Simpson, New York City, of counsel.

Shearman & Sterling & Wright, McClellan & Shrewsbury, New York City, for De-

450

fendant National City Bank of New York. Joseph M. Proskauer, Philip A. Carroll, Otey McClellan, J. Alvin Van Bergh, Martin J. Cunningham, New York City, of counsel.

RIFKIND, District Judge.

The first entitled action was commenced on August 1, 1947 and the second, on March 28, 1939. Both were tried to the court together.

In form the first is an action by the assignee of a bank-account against the bank for the balance owing to the depositor, demand having been made and refused. In addition, the complaint seeks a declaration that the Receivers have no interest in the deposit-account.[1] The simplicity of the form of the action, however, is but the deceptive facade behind which hover a host of questions produced by the rupture of normal Russo-American relations after the collapse of the Kerensky regime in 1917.

The action of the Receivers is based upon a complaint which alleges that they were appointed, by a judgment of the Supreme Court of the State of New York, receivers of the assets in New York of Russo-Asiatic Bank, pursuant to Sec. 977-b of New York Civil Practice Act; that they duly demanded the balance of the Russo-Asiatic account from National City Bank and that their demand was refused. Jurisdiction is founded on 12 U.S.C.A. § 632.

I. The Receivers' Action.

What was said with respect to the claim of the Receivers in Steingut v. Guaranty Trust Co., 1944, D.C.S.D.N.Y., 58 F.Supp. 623, affirmed 2 Cir., 1947, 161 F.2d 571, certiorari denied 1947, 332 U.S. 807, 68 S.Ct. 106, 92 L.Ed. 385, is applicable hereto and is dispositive of the issue. The Receivers have advanced a new argument. They urge that a foreign law (the Russian banking decrees) purporting to transfer title to property in New York (from Russo-Asiatic to Soviet Russia) is not self-executing; the property must be actually reduced to possession, with or without intervention of local judicial process, before the transfer of title is perfected.

Clark v. Williard, 1935, 294 U.S. 211, 55 S.Ct. 356, 79 L.Ed. 865, 98 A.L.R. 347. Therefore, argue the Receivers, there was no such barrier to the vesting of title in the Receivers as was suggested in Steingut v. Guaranty Trust Co., supra.

It is unnecessary to repeat what has been said in the Steingut case. A few additional comments will suffice. Section 977-b, though enacted in 1936, after recognition of Soviet Russia, is, in its application to Russo-Asiatic, fore and aft, starboard to port, keel to masthead, built upon the conception of non-recognition. It collides head-on with the national policy embraced in recognition and the Litvinov assignment. This case is not distinguishable from U. S. v. Pink, 1942, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, as the Receivers contend, by the circumstance that in the Pink case local creditors had been paid. The local creditors in the Pink case were "creditors whose claims arose out of dealings with the New York branch", 315 U.S. at page 226, 62 S.Ct. at page 564, of the First Russian Insurance Co. Russo-Asiatic never had a branch in New York. Like the Pink case, "The contest here is between the United States and creditors of the Russian Corporation * * * whose claims did not arise out of transactions with the New York branch". 315 U.S. at page 227, 62 S.Ct. at page 564. In such a case, U. S. v. Pink held Clark v. Williard, supra, inapplicable.

■ Pink was a state-created stakeholder who had possession. The receivers are state-created stakeholders who seek possession. The claim of the former yielded to the superior title of the United States. *A fortiori* the claim of the latter must yield to that of the United States.

1. The answer pleads seven affirmative defenses: pendency of another action, the Statute of Limitations, payment, offsets for Ruble losses, offsets for Russian Notes and Bonds, outstanding attachments, and offsets for an unsatisfied judgment against Russo-Asiatic Bank. I have passed on none of these except the one discussed herein.

## II.  The Government Action.

Russo-Asiatic Bank was a large and powerful banking institution organized under the laws of Imperial Russia.  Its head office was in Petrograd and it operated branches in many countries.  Sometime prior to 1917 it opened an account at the head office of National City Bank in New York City.  On December 27, 1917, the amount standing to the credit of Russo-Asiatic on the books of National City Bank was $2,261,981.72.

On November 7, 1917 the Provisional Government of Russia, which had been recognized by the United States following the Czar's abdication, was overthrown by the Bolshevik revolution.  The Soviet Government, installed by the revolution, remained unrecognized by our Government until November 16, 1933.

On December 27, 1917, Russo-Asiatic was, by Soviet decree, merged with the State Bank of Russia, a department of the government; and subsequently, on January 19, 1920, the State Bank, whose name had been changed to People's Bank, was abolished and its surviving functions, assets, and liabilities transferred to the Central Budget and Accounting Department of the Soviet Government.

On November 16, 1933, by the Litvinov Assignment, Soviet Russia transferred to the United States whatever claims it had against National City Bank.  On January 17, 1936, the United States made a demand for payment, which National City Bank refused.

In its brief, the Government has reduced the principal amount of its claims to $2,010,847.45.[2]

The Government has established the allegations of its complaint and, on the authority of U. S. v. Pink, 1942, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 and Steingut v. Guaranty Trust Co., D.C.S.D.N.Y., 1944, 58 F.Supp. 623, affirmed, 2 Cir., 1947, 161 F.2d 571, certiorari denied 1947, 332 U.S. 807, 68 S.Ct. 106, 92 L.Ed. 385, it is entitled to judgment unless one or more of the affirmative defenses pleaded by National City Bank is sufficient to exonerate it.  I have concluded that one of the offsets pleaded has been established in fact and is good at law and deprives plaintiff of its right to recover.

The facts which give rise to this defense are as follows:

On May 1, 1917, the Provisional Government of Russia, recognized by our Government, sold an issue of Russian Treasury Notes.  These Notes were made in Washington, and were payable at National City Bank, in New York, in dollars.  They bore interest at the rate of 5% per annum and were to mature on May 1, 1918.  From time to time, on request of the accredited representatives of the Provisional Government, and with the approval and encouragement of our Government, the holders of the Notes extended their maturity to November 1, 1919.  On that day they were defaulted.

These extensions of maturity were so granted by the holders after Soviet Russia, then unrecognized by the United States had, by decree, dated January 21, 1918, repudiated its obligation on the Notes.

---

2.  The Government has deducted from its claim a number of payments made by National City Bank out of Russo-Asiatic's account which, if not acknowledged as valid, would subject the bank to double liability.  It challenges, however, the following debits to the Russo-Asiatic account:

| | | |
|---|---|---|
| Feb. 1, 1921, | $1,275.317.79 | Russian Corporation |
| Apr. 4, 1921, | 500,000. | Equitable Trust Co. |
| Oct. 8, 1924, | 2,226.20 | Tamara Volishioli |
| Feb. 18, 1925, | 680. | Anna Ingerman |
| Apr. 11, 1933, | 232,623.66 | Herbert J. Grant |

At the time of trial National City Bank held such Notes in the principal amount of $4,435,000.[3]

The question is whether National City Bank may set off these Russian obligations against Soviet Russia's claim to the deposit account, asserted by its assignee, the United States.

I begin with the acceptance of the plaintiff's major premise: that by virtue of the recognition of the Soviet regime in 1933, the validity of the Soviet banking decrees must be retroactively acknowledged. U. S. v. Pink, 1942, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796; Steingut v. Guaranty Trust Co., D.C.S.D.N.Y., 1944, 58 F.Supp. 623, affirmed 2 Cir., 1947, 161 F. 2d 571, certiorari denied 1947, 332 U.S. 807, 68 S.Ct. 106, 92 L.Ed. 385. It follows that on December 27, 1917, Soviet Russia became the owner of the Russo-Asiatic account at National City Bank. Had National City Bank on that day possessed the necessary prescience it would have altered the name of its depositor from Russo-Asiatic Bank to that of State Bank of Russia or Soviet Government.[4] The position of Soviet Russia, on this premise, was the same as if it were the assignee of the Russo-Asiatic account. Thenceforth, National City Bank could treat Soviet Russia as a depositor who had to its credit $2,261,981.-72. It necessarily follows that the credit balance became available for set-off against Soviet debts to National City Bank, in those instances in which the equitable doctrine of set-off obtains. .

I turn now to the second member of the set-off equation—The Russian Treasury Notes. Again accepting the premise that retroactive effect must be given to recognition, it must be acknowledged that on November 7, 1917, the date of the revolution, Soviet Russia became the obligor on Russia's Treasury Notes. Another way of saying it is that the State of Russia was the obligor on the Notes before the revolution and that the State of Russia continued as the obligor after the revolution. The regime in power changed. The state, as a continuing personality, persisted. The Sapphire, 1871, 11 Wall. 164, 20 L.Ed. 127; Guaranty Trust Co. v. U. S., 1938, 304 U.S. 126, 137, 58 S.Ct. 785, 82 L.Ed. 1224; 1 Moore International Law Digest, (1906) 334; 37 Op.Atty.Gen. 505, 513 (1934). That the Soviet Government so understood its obligations is implicit in the decree of repudiation made on January 21, 1918. There would have been no occasion for repudiation were there no obligation.

On November 1, 1919 the Notes fell due. They were payable at National City Bank. They were, therefore, the equivalent of orders "to the bank to pay the same for the account of the principal debtor thereon". N. Y. Negotiable Instruments Law, McK.Consol.Laws, c. 38, § 147; U. S. v. National City Bank, 3 Cir., 1936, 83 F.2d 236, 239, certiorari denied 1936, 299 U.S. 563, 57 S.Ct. 25, 81 L.Ed. 414. That order National City Bank could execute[5] unless the act of repudiation prevented it. But if repudiation had such an effect, the set-off

3. From this amount should be deducted $230,761.68 comprising the amount heretofore set off by National City Bank against other claims:
U. S. v. National City Bank $151,499.81
Zemsky Union · $ 79,261.87
National City Bank came into posses-. sion of these Notes in the following manner. On May 1, 1917 it purchased $2,750,000 face amount, at 97. On May 1, 1917 Farmers' Loan & Trust Co. purchased $2,000,000, at 97. On September 1920 National City Bank sold $300,000. On December 30, 1920 it sold $2,000,000. On September 2, 1921 National City Bank bought from Farmers' Loan & Trust Co. $2,000,000, at 15. On Septem-

ber 2, 1921 F. L. & T. Co. bought $2,000,-000, at 14⅞. On June 29, 1929 F. L. & T. Co. merged with National City Bank and National City Bank thereby acquired $2,000,000.

4. For a time its foresight would have been regarded as error. Hoppe v. Russo-Asiatic Bank, 1923, 235 N.Y. 37, 138 N.E. 497, affirming 200 App.Div. 460, 193 N.Y. S. 250.

5. Indeed, it may be that the obligor is discharged if the banker omits to execute the order and fails. Baldwin's Bank of Penn Yan v. Smith, 1915, 215 N.Y. 76, 109 N.E. 138, L.R.A.1918F, 1089, Ann. Cas.1917A, 500.

should have been disallowed in U. S. v. National City Bank, supra. The decision in that case is, therefore, precedent—though of moderate weight—that repudiation may not bar the set-off in this case.[6]

■■ To that decision has been added the force of the distinction drawn in Guaranty Trust Co. v. U. S., supra, 304 U.S. at page 140, 58 S.Ct. at page 792, 82 L.Ed. 1224, "between the effect of our recognition of a foreign government with respect to its acts *within its own territory* prior to recognition, and the effect upon previous transactions consummated here between its predecessor and our own nationals". (Emphasis added.) The impact of repudiation by a sovereign within its own territory is governed by the law which prevails in that territory. But obligations created here and here performable are governed by local law. Central Hanover Bank & Trust Co., D.C.S.D.N.Y.1936, 15 F.Supp. 927, affirmed 2 Cir., 84 F.2d 993, certiorari denied 299 U.S. 585, 57 S.Ct. 110, 81 L.Ed. 431. Repudiation by a foreign sovereign of obligations subject to our domestic law is effective only to the extent that its sovereign immunity shields it from suit. Wherever the shield of sovereign immunity is not available there is nothing to prevent our domestic law from taking its course. Here, if the set-off is appropriate, immunity is not available. Guaranty Trust Co. v. U. S., supra, 304 U.S. at page 134, 58 S.Ct. 785, 82 L.Ed. 1224; U. S. v. National City Bank, supra, 83 F.2d page 238.

Nor can the repudiation be regarded as a revocation of the bank's authority to pay the Notes for the account of the obligor. As already indicated, some time after the Soviet Government had repudiated the Treasury Notes, our Government cooperated in securing from the holders an extension of maturity, on request of the then recognized representatives of the Russian

State. Relevant is the language of Guaranty Trust Co. v. U. S., supra, 304 U.S. at page 140, 58 S.Ct. at page 792, 82 L.Ed. 1224: "The very purpose of the recognition by our government is that our nationals may be conclusively advised with what government they may safely carry on business transactions and who its representatives are." Were it held that the repudiation of 1918 must now be considered a part of our municipal law, or that the repudiation is operative as a revocation of the banker's authority, so as to convert these domestic obligations into scraps of paper for all purposes, then the words "conclusively" and "safely" would have to be stricken from the Court's opinion.

Does the allowance of this set-off conflict with the national policy as expressed in the Litvinov Assignment? I think it does not; or at least no more so than allowing the set-off in U. S. v. National City Bank, supra, or in giving effect to the Statute of Limitations in Guaranty Trust Co. v. U. S., supra. The United States took Russia's claims subject to their infirmities. No conflict with national policy is generated by acknowledging and giving effect to an infirmity when it is discovered.

■ Historically, it is of course true that National City Bank did not lend Russia the proceeds of the Treasury Notes in reliance upon the security of the Russo-Asiatic account. 3 Story's Equity Jurisprudence, 14th Ed., Sec. 1871. Historical reliance in fact, is, however, unnecessary to render mutual debts capable of being set off by a bank. Were it otherwise, deposits put to the credit of an account after the debt was incurred would not be subject to set-off. The law draws no such distinction.[7] New York Negotiable Instruments Law, § 147; Ætna Nat. Bank v. New York Fourth Nat. Bank, 1871, 46 N.Y. 82, 7 Am. Rep. 314; National Bank of Newburgh v. Smith, 1876, 66 N.Y. 271, 23 Am.Rep. 48.

---

6. I recognize that repudiation could not have been pleaded in the trial court, for the action was instituted by the Provisional Government before recognition of the Soviet Government. However, after recognition, the United States was successful in having itself substituted, State of Russia v. National City Bank, 2 Cir., 1934, 69 F.2d 44.

7. If Corporation A has a credit balance in its account at a bank and Corporation B is indebted to the bank on a note payable at the bank, and A and B are merged, I should have no doubt that the bank could apply A's credit to B's debt. Plaintiff concedes as much in its brief.

454

It is, of course, painfully clear that to reach the conclusion that the defense should be sustained I have traversed a bridge built of fictions. "Retroactivity" of Soviet recognition in 1933 commands us to treat the Russian decrees of 1917 *as if* the United States had recognized the Soviet Government on the day of the revolution. That fiction prevails until it collides with another, that the accredited agents of the Provisional Government must, at least in some respects, be treated *as if* there were a government whom they represented. Despite the cataclysmic character of the Bolshevik revolution, we must treat the Soviet Government as the uninterrupted extension of the empire of the Czars. These fictions, however, are the tools which the courts have forged for shaping the answers to the kind of questions which this case presents.

Plaintiff stoutly resists the arguments in favor of set-off and appeals to two lines of reasoning, which for convenience may be denominated legal and equitable.

The legal argument is founded upon Soviet Russia's immunity. In order to raise that shield, it asserts that the Notes and the Russo-Asiatic deposit account did not arise out of the same transaction. If the deposit is the property of Russo-Asiatic and the Notes are the obligation of the Russian State, then the credit and debit do not arise out of the same transaction and one may not be used to pay for the other. But plaintiff itself insists that since December 27, 1917, not Russo-Asiatic but Soviet Russia owned the account. Let us suppose that, absent the banking decrees, on December 27, 1917 Russo-Asiatic had drawn a check on its account in favor of Soviet Russia, and that the latter had then caused it to be deposited in an account in its own name in National City Bank. Would not National City Bank be free to apply such a credit balance to a debt of Soviet Russia payable at National City Bank, whether the holder of the obligation was itself or another? Would Soviet Russia be heard to say that the credit arose out of another transaction?

When a depositor deposits moneys to his account in a bank, the bank may apply them to discharge his obligations, *payable at the bank,* without inquiring whether the deposit consisted of proceeds of a transaction in some way related to the debt. Section 147 of N.Y. Negotiable Instruments Law and the antecedent law which it codified, Ætna National Bank v. Fourth National Bank, 1871, 46 N.Y. 82, 88, 7 Am. Rep. 314, reflect a "commercial usage" that a note of a depositor payable at his bank may be paid by access to his deposit-account. See K. & K. Silk Trimming Co. v. Garfield National Bank, N.Y.App.Term, 1926, 127 Misc. 27, 215 N.Y.S. 269.

To accept plaintiff's argument, one would be compelled to deny that on December 27, 1917 Soviet Russia became the owner of the deposit account at National City Bank theretofore standing in the name of Russo-Asiatic; and such a denial would take the props from under the whole of the Government claim.

As plaintiff would maintain the separate personality of Russo-Asiatic, but only when expedient to meet the defense advanced by National City Bank, so it would have the Soviet Government treated as quite a distinct sovereign from its predecessor regime. Only on such an hypothesis can it be argued that the Notes were not the debt of Soviet Russia. If, however, we are to give full and retroactive effect to recognition, as plaintiff insists that we must, then we must acknowledge that the Soviet Government represents the same Russian State as the Provisional Government represented, the same corporation sovereign under a new name and style, represented by new agents whose authority our Government, by the act of recognition, has conclusively established.

At this point plaintiff falls back upon repudiation. Were the Notes governed by Russian law repudiation might be a safe refuge. The Notes, however, were made in Washington, were issued originally to secure funds to pay for American products purchased in the United States, were payable in New York, at National City Bank, in United States currency. Even if full effect be given to the presumption that the obligations of a sovereign are intended to be governed by the law of the sovereign,

Smith v. Weguelin, M.R.1869, L.R. 8 Eq. 198, 212; Goodwin v. Robarts, H. of L., 1876, 1 App.Cas. 476, 494; The Brazilian Loans, Publications of the Permanent Court of International Justice, Series A. No. 20/21, p. 93, 121; but compare, Rex v. International Trustee (1937) A.C. 500, 530, it is nevertheless clear to me that the history and form of the Notes amply rebut any such presumption.

Equally hapless is the argument that repudiation, if not operative as governing law, is at least effective as a revocation of the implied authority annexed to the Notes to pay them out of the obligor's account. That argument fails because, in fact, the extension of the Notes by the recognized representatives of Russia occurred after the decrees of repudiation,[8] and in law, at least as to the Notes acquired before repudiation, because the authority relied on by plaintiff to support revocability holds that revocation by the obligor is ineffective where the bank is itself the owner of the Note. K. & K. Silk Trimming Co. v. Garfield National Bank, N.Y.App.Term, 1926, 127 Misc. 27, 215 N.Y.S. 269.[9]

Plaintiff's appeal to equitable consideration is based upon the contention that the United States is engaged in marshalling assets in order to create a pool out of which all American creditors of Russia might satisfy their claims pro-rata, whereas defendant, National City Bank, is seeking to secure preferential treatment for its own claims.

I need not consider this appeal. Whether the President, by virtue of his authority over our international relations, or the Congress could have modified the rights of Russia's American creditors and debtors for the purpose of making an equal or more equitable distribution to all American creditors, is a question I am not called upon to investigate. The short answer is that neither the President nor the Congress did anything of the sort. The United States simply stepped into Russia's shoes. The complaint, as already noted, states a simple claim at law for the balance standing to the credit of a bank depositor. The Government has chosen to have its claim appraised by such a standard.

Plaintiff argues, in addition, that defendant's conduct has not always been consistent in its reliance upon the Notes as the means of discharging its liability on the deposit account. I do not stop to consider whether some thread of consistency may be discovered. It would be fatuous for the courts to close their eyes to the history of improvisation which has characterized the long period of non-recognition of Russia. "One cannot read this body of judicial opinions, in the Divisional Court, the Court of Appeal and the House of Lords, in the New York Supreme Court, the Appellate Division, and the Court of Appeals, and not be left with the conviction that they are the product largely of casuistry, confusion, and indecision". Frankfurter, J. in U. S. v. Pink, 315 U.S. 203, 235, 62 S.Ct. 552, 564, 86 L.Ed. 796.

When the problem is so complex as to produce such an effect upon the most sophisticated courts, it would hardly be equitable to expect of the defendant that its conduct should be always precise, exact and

---

8. The fictions and vagaries which this argument lead to is here well illustrated. To sustain its contention, plaintiff is under the necessity of arguing that the Provisional Government intended its Notes to be governed by Soviet law! Moreover, when the Notes were extended, plaintiff must argue that it was the sovereign maker's intention that they should be subject to the Soviet decree of repudiation, enacted before the extension, so that, in effect, they died in the very act of their creation.

9. In that case the Court said, 127 Misc. at page 30, 215 N.Y.S. at page 272, "The bank was entitled to have these notes paid, or to offset them against its depositor's account, notwithstanding * * * any direction to stop payment of notes * * * which might be presented by third persons."

The concurring opinion states, 127 Misc. at page 33, 215 N.Y.S. at page 275, "It is perfectly true that no such notice could affect the right of the bank to repay itself out of the funds of the depositor the value of any note which it had discounted * * *."

In the case at bar National City Bank was the owner and holder of the Notes. As to $435,000 it has been the owner and holder from the time of original issue.

consistent. No doubt it reached for the deposit account with as many hands as it could manage. Sufficient it is that at least once its grasp was equal to its reach.

The question of the amount of the set-off presents no difficulty.[10] National City Bank is the holder of Treasury Notes in a principal amount sufficient to extinguish the deposit-account. The acquisitions and sales of these Notes by National City Bank have already been narrated, supra, footnote 3. Acquisitions subsequent to the first were effected at a price very much below par. I regard these events as irrelevant to the present inquiry. The significant fact is not that National City Bank continuously held a specified number of Notes but that the Notes were payable *at* National City Bank. U. S. v. New York Trust Co., D.C. S.D.N.Y.1946, 75 F.Supp. 583. That fact never changed. It was that provision of the Notes which made them the equivalent of orders to the bank to pay them out of the obligor's account. U. S. v. National City Bank, supra.

Since the claim of Soviet Russia is subject to a set-off of defendant's claim against Soviet Russia, which is sufficient to extinguish it, plaintiff, as assignee of Soviet Russia, takes nothing under its complaint.

10. The time of set-off may be important in calculating interest accruing on the two obligations at different rates.